ANSEL B. WATSON, APPELLEE, V. I. OTIS MILLER, APPELLANT.

FILED MAY 19, 1936. No. 29555.

*N. P. McDonald* and *George A. Munro,* for appellant.

*Hamer & Tye, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

PAINE, J.

In an action for personal injuries following a collision between a load of logs and an automobile, the jury returned a verdict for $15,000. As a condition for overruling the motion for a new trial, a remittitur was filed for $9,000 and judgment entered for plaintiff for $6,000. Defendant appeals.

The bill of exceptions discloses that the plaintiff was about 58 years of age, and had lived for years some seven miles south of Kearney, but about the 1st of March, 1933, he had left his farm and had moved to Kearney. During the time that he had lived there, he had painted a couple of small houses, had put up a little hay, worked on the road with a team, and done other odd jobs.

On the day of the accident, the plaintiff with a neighbor was returning to Kearney with five large cottonwood logs, which they had cut that day and loaded on the trucks of the wagon. A paved state highway runs directly south from the city of Kearney to the Platte river bridge, which is located a mile and a half south of Kearney. Formerly this bridge was a mile long, but when the new bridge was constructed it was made much shorter by filling in high embankments at each end of the bridge. South of the bridge there is a road going west, at which point the paving stops. There is also a filling station at this point. About a mile farther south is what is known as Meyer's corner, from which point a road runs east to Lowell and then south to Minden. The plaintiff and his neighbor had cut these logs a short distance east of Meyer's corner and were hauling them to Kearney on a low-wheeled truck pulled

by a team. At Meyer's corner certain road implements are kept, and the plaintiff stopped to visit with the maintainer men and started on slowly to the city of Kearney, the plaintiff riding on the front end of the logs. It was nearly 6:00 p. m. on December 8, 1933, and dark, and all of the automobiles were running with their lights on. When they had reached a point about half way between the filling station and the south end of the bridge, the defendant overtook them, driving a Chevrolet coupé. He testified he did not see this load of logs until he was 30 or 40 feet from it on account of the bright lights of the string of cars coming towards him from the north. When the defendant saw the logs, he first swerved his car to the west side of the road, but as the paving was only 18 feet wide and there was a very sharp decline of about 15 feet down the high embankment to the sand of the river-bed, and as a car was approaching rapidly from the north and would strike him, he turned back towards the east side of the road and struck the rear wheel under the load of logs. The collision shoved the wagon over a little and broke one spoke in this wheel and bent in the right front fender of the automobile. However, the force of the collision caused the plaintiff to fall from the front end of the wagon to the pavement. The defendant took the plaintiff to his home in Kearney, and called Dr. Stearns and asked him to go over and examine the plaintiff and find out his condition. After a very careful examination, Dr. Stearns found no evidence of fractured bones, but found that plaintiff's teeth were in a very bad condition; that he had lost all of his lower teeth, had only 13 upper teeth, and that the processes had been absorbed and pus was oozing freely from his gums. He made an examination of his heart and found the plaintiff was suffering from a disease of the heart which prevented the valves from meeting and closing, and that his arteries were in a very advanced stage of arteriosclerosis. Three days later this Dr. Stearns went back, although he had not been called by the plaintiff, and found that the muscles over his back

were tense, and found a sore condition such as might result from an injury. He told plaintiff that he was employed and paid by the defendant to take care of him, and that it would not cost him a cent to call him back again, but he was never called by the plaintiff. He testifies that the condition in the muscles of plaintiff's back was such as you would expect soon to disappear. After a few days the plaintiff got up and went to see Dr. Bennett, who prescribed for his nervousness and to relieve his pain, and no further medical attention is disclosed by the evidence until after the plaintiff brought suit against the defendant for $35,000.

In the petition it was alleged that plaintiff was driving at a speed of 50 miles an hour, failed to keep a lookout, neglected to slacken his speed after he discovered the loaded wagon; that his automobile was out of control, and that, as a direct result of these acts of negligence, the plaintiff was thrown to the paved highway, where his head was cut and bruised and he sustained concussion of the brain; that the bones, muscles, and nerves of his back were crushed; that the injuries are of a permanent nature, and have caused him great pain and suffering; that as a result of the injury his spine has become permanently stiffened; that at the time of the injuries he was a strong, able-bodied man, capable of earning $3,500 a year, and that as a result of the negligence of the plaintiff he has been totally disabled and rendered physically and mentally unfit to engage in any occupation, and his earning capacity is entirely destroyed. Nine large X-ray pictures accompanied the bill of exceptions. The X-ray pictures introduced by the plaintiff were taken by Dr. Johnson, while those introduced by the defendant were taken under the direction of Dr. Stearns at the Good Samaritan Hospital in Kearney.

The defendant called Dr. A. F. Tyler, of Omaha, the attending radiologist of St. Joseph's Hospital, Omaha, since 1909, and who has specialized in X-ray work. From an examination of the X-ray pictures introduced in evidence,

he testified that the bony deposits on the edge of the spine had been going on from 15 to 20 years; that there was no indication of any fracture of a ligament which had become ossified, but that there was a lipping of some of the vertebræ, caused by the laying down of a bony deposit; that there was nothing shown in any of the pictures that indicated any fracture of the spine. In answer to a hypothetical question, he testified that in his opinion the result of the fall from the wagon to the paving was a muscular injury, and that the condition of the spine as shown by the X-rays was not the result of the injury in the fall to the pavement. There is no doubt that some of the tissues of the backbone had been replaced with calcium deposit. Dr. Stearns testified that it was utterly impossible for plaintiff's condition to have developed in the short time between the date of the injury and the date when the pictures were taken, and that the condition of his back was the result of a bacterial infection that got into his bloodstream from the bad conditions in his mouth, and that caused the arthritis in his backbone. When Dr. Stearns was asked whether plaintiff's condition at the time of the trial was the result of any injury he might have sustained December 8, 1933, he testified positively: "No; no. Absolutely not."

Dr. Tyler was asked the question, "Then because of the fact that this condition exists could you say whether or not that was the result of some injury?" and his answer was: "No; this condition is not in my opinion the result of injury."

The plaintiff testified that when the collision occurred he was thrown from the top of the load of logs down to the paved highway and was picked up unconscious. He says he was in a daze, and claims that blood came from his ear, and that he was not conscious of his surroundings until about the second time that Dr. Stearns called. From that time on, he testifies, he could not raise himself from his chair or get up from the floor until he could take hold of something with his hands to lift on, and he could not

lean over to pick up anything from the floor, as it would throw him out of balance and he would fall down. On the other hand, Dr. Stearns testifies positively that plaintiff was perfectly conscious the first time he called after the accident, and made no complaint of injury to his head, and that he had no skull injury. During the trial the plaintiff was in the courtroom and was helpless, and the jury saw him and heard his testimony, and his doctor testified that his condition was the result of this injury.

Defendant complains of errors in the instructions. We find the court gave 24 instructions, some of which were over two pages long. It is charged that instruction No. 5 is totally inapplicable to the issues in this case. A few paragraphs of this instruction read as follows:

"The driver of an overtaking motor vehicle not within a business or residence district as herein defined shall give audible warning with his horn or other warning device before passing or attempting to pass a vehicle proceeding in the same direction.

"The driver of a vehicle shall not drive to the left side of the center line of a highway in overtaking and passing another vehicle proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be made in safety."

"The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard to the speed of such vehicles and the traffic upon and condition of the highway."

In the closing paragraph of the fifth instruction the court says to the jury: "These statutes are for your information as to the law in the case, but if you find from the evidence in the trial that these statutes or any of them have been violated, then you are instructed that it is a circumstance which you may take into consideration in determining whether or not the party so violating was guilty of negligence."

It is claimed that the petition did not allege any of these

acts as negligence, and the defendant's only defense was that he did not see the load of logs until he was within approximately 30 feet of them, by reason of the glaring headlights of approaching cars. It is insisted by the defendant that the giving of this instruction No. 5 was reversible error.

We find on examination that these instructions were given to the jury on December 14, 1934. These paragraphs were taken, with minor changes, from sections 39-1142 and 39-1143, Comp. St. Supp. 1931, and each of these sections was repealed by the 1935 legislature. The jury were not bound to accept either plaintiff's or defendant's explanation as entirely true, and must have found negligence in the manner in which defendant attempted to pass the load of logs.

It is a general rule that judgments are not set aside for errors in instructions unless there is, first, error, and, second, prejudice resulting from it, and we cannot see how the defendant was prejudiced by giving the statutory rules of the road as then in force.

The first error set out in the motion for a new trial is that the verdict is excessive, and in the brief of the defendant we find set out: The verdict and judgment are not sustained by sufficient evidence; (a) it is not shown by a preponderance of the evidence that the negligence of the defendant was the proximate cause of plaintiff's disability; (b) the damages allowed by the verdict and judgment are not supported by sufficient competent evidence; the damages awarded to the plaintiff are excessive, appearing to have been given under the influence of passion, mistake, or prejudice.

The verdict returned by the jury was for the sum of $15,000. After argument of the motion for new trial, the trial court ordered a new trial unless plaintiff should file a remittitur of $9,000 within five days. The remittitur was filed, and judgment was finally entered for $6,000.

The power of setting aside a verdict on the ground that it is excessive is one that is to be used very sparingly.

*Southern Cotton Oil Co. v. Thomas,* 155 Ga. 99, 117 S. E. 456. As the assessment of damages is peculiarly the province of the jury, this court has been very cautious in overthrowing verdicts on this ground. 20 R. C. L. 281, sec. 64.

A verdict will not be reversed simply because the appellate court might have decided differently on the same facts.

The first duty to pass upon the justness of the amount of this verdict rested with one of the oldest and most experienced trial judges in our state, and in the exercise of sound discretion, and in his best judgment, he found insufficient evidence to sustain the verdict awarded, and he did not hesitate to require remittitur of $9,000 to be filed.

While it is usually said that a verdict should only be set aside when it is apparent that the jury had either misapplied the law or had been influenced by their prejudices or passions rather than by an observance of the law and the facts of the case as shown by the evidence, it is also true that, while great latitude has been allowed to juries in estimating damages, yet to this power there must be some limit. *New Orleans, J. & G. N. R. Co. v. Statham,* 42 Miss. 607, 97 Am. Dec. 478; *Neeley v. Snyder,* 193 S. W. (Mo. App.) 610.

It appears possible that the jury may in the case at bar have been misled by some mistaken view of the merits of the case, or for some reason may have disregarded the testimony of the defendant's medical witnesses.

In an early case, tried in 1808, it was generally stated that, when the damages are so excessive that it may reasonably be presumed that the jury in assessing them did not exercise a sound discretion, but were influenced by passion, partiality, prejudice, or corruption, the court may set aside the verdict and send the cause back to another jury for revision. However, there must be satisfactory evidence in the record that the damages are excessive and that the jury acted intemperately. *Coffin v. Coffin,* 4 Mass. 1, 3 Am. Dec. 189.

It is not sufficient for a party who seeks a new trial on the ground of excessive damages merely to raise a doubt as to whether or not the verdict is large. It is incumbent on him to show affirmatively and satisfactorily that it is, and to what extent. *Clark v. Whitaker* (1848) 19 Conn. 319, 48 Am. Dec. 160; *Coffin v. Johnson,* 117 Me. 565, 104 Atl. 369.

In the case of *Schafer v. Missouri Valley Pipe Line Co.,* 123 Neb. 669, 243 N. W. 889, this court considered a case in which damages were asked for the construction of a pipe line across a strip of land 65 feet wide and 91 rods long, and injury to a gate. The plaintiff had cashed a voucher for $20 for the right of way. The jury returned a verdict for $2,556.45. It was held that the verdict was beyond all reasonable limits of compensation warranted by the evidence. The presumption was therefore raised that the verdict was not based upon sober judgment of the testimony given by witnesses upon the stand, but was based upon mistake or passion and prejudice. We were compelled to find that the amount of the verdict was not supported by sufficient competent evidence, and was so clearly wrong as to induce the belief that it could not have been reached without partiality.

In the fourth division of section 20-1142, Comp. St. 1929, it is provided, among the grounds for new trial, that excessive damages which appear to have been given under passion and prejudice is a good ground. The verdict in the case at bar clearly comes within such a provision. It was so excessive as to be entirely unjustified, and as there must be a new trial we will not discuss the evidence further.

The following are a few of the cases in point: *Sternberger v. Sanitary District,* 100 Neb. 449, 160 N. W. 740; *Wiles v. Department of Public Works,* 120 Neb. 689, 234 N. W. 918; *Trute v. Holden,* 118 Neb. 449, 225 N. W. 238; *Abrashkov v. Ryan,* 114 N. Y. Supp. 973; 46 C. J. 430.

It is also our opinion that the judgment remaining after the trial court fixed a remittitur of $9,000 is still excessive,

for there is no substantial basis in the evidence for damages in such an amount. Further, we find it impossible to discover a proper basis for reducing the amount. Therefore, the case is sent back for trial to another jury, and the judgment

REVERSED.