HENRY S. COLLINS, APPELLEE, V. HUGHES & RIDDLE ET AL.,
APPELLANTS.

278 N. W. 888

FILED APRIL 1, 1938. No. 30132.

*Gaines, McLaughlin & Gaines* and *Harold A. Palmer,* for appellants.

*McGan & Burbridge, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ., and ELDRED, District Judge.

EBERLY, J.

This is an action at law to recover damages for personal injuries received by plaintiff on November 28, 1934. On that day plaintiff was riding as a passenger in a Chevrolet coupé, proceeding west on Maple street in Douglas county on the paved highway, about 2 o'clock p. m. on a bright, clear day, when the defendants, driving a large refrigerator truck proceeding west, overtook and negligently struck the automobile in which plaintiff was riding in its rear and knocked the same a considerable distance. In his original petition plaintiff alleges that as a result of the collision he suffered a severe sprain of the sacroiliac joint, a severe concussion of the brain, and a severe sprain of the right shoulder and of the neck. Later plaintiff amended his petition by stating that as a result of this accident plaintiff also suffered a compression fracture of the third lumbar vertebra and a subluxation of the fourth lumbar vertebra, commonly called a broken back, and alleged further the results of the injuries so received.

Defendants, in their answer, put in issue the claims of the plaintiff, and denied the negligence by him alleged. They further set forth that, "on December 10, 1934, negotiations were entered into between plaintiff and defendant for a compromise and a settlement and as a result thereof a compromise and settlement was made of all claims of whatsoever character the plaintiff may have had against this defendant and the alleged partnership for the sum of $15, which said sum by way of settlement and compromise was paid to plaintiff."

To this answer, plaintiff's reply, in addition to a general denial, in substance, alleged that the settlement actually made embraced only an adequate compensation for his damaged pipe, his injured watch, and the payment of his doctor bill, and that, as to the release pleaded by defendants, the same was the result of mutual mistake of all parties, and fraud exercised by defendants in the procurement thereof.

There was a trial to a jury, and a verdict was returned for plaintiff for $15,000. The trial court directed a remittitur of $10,000 by plaintiff. This order being complied with, the motions of defendants for a new trial and for judgment *non obstante veredicto* were each denied, and judgment was entered for the sum of $5,000 against defendants, from which they prosecute this appeal. Plaintiff Collins prosecutes a cross-appeal.

It may be said that the occurrence of the accident on November 28, 1934, and the infliction of severe injuries on plaintiff are amply sustained by the evidence. Plaintiff was taken home from the scene of the collision, treated by a physician, and remained in bed some three days. About the last of December following he went to see a physician. At this time he had a lump on his back that had never been there before. His evidence is that after this accident he could not do any lifting or heavy work; that he was restless, and had pains in his back and legs all of the time. The attending physician at the time testifies that the condition of Collins' back in December, 1934, was

different than when he had seen him in the spring of 1934; that there was now a lump on his back about the third vertebra; that Collins, who was on relief, did not have any money to pay for X-rays and none were taken until March 30, 1936, which were introduced in evidence. Plaintiff's experts testify that these photographs disclose that the third lumbar vertebra had been crushed, and the fourth partly dislocated, which is called subluxation; that the vertebra which was crushed is about one-third of its normal width; that it is a permanent injury; that the fracture had been present less than two years because the healing was not complete when the picture was taken. Indeed, this crushed condition of the third vertebra does not appear to be a matter of dispute. The evidence in the record, notwithstanding its conflicting nature, considered as an entirety, if believed by the jury, forms ample support for a verdict in favor of plaintiff.

The defendants contend that the execution of a release and assignment by the plaintiff on December 10, 1934, and the acceptance by him of the sum of $15, operated as a complete settlement and discharge of all liability on their part.

The following is a photostatic copy thereof:

It will be noted that we have here an ordinary printed blank which has been completed with pen and ink, but that between the third and fourth lines appear in typewriting the words "known and unknown," and likewise between the tenth and eleventh lines the typewritten words "injuries, known & unknown."

The record fails to disclose the presence of a typewriter, portable or otherwise, at the scene where this instrument was made out and the signatures thereto affixed. The evidence is also uncontradicted that Ed Fagen, shown as a witness on the above instrument, was wholly absent from the entire transaction, and that he affixed his signature at a place some miles distant from where the negotiations of settlement were had.

In their brief appellants treat the inserted typewritten words as regularly interlined and regularly connected with the printed portion of the instrument by "carets."

The "caret," it may be said, is a definite character of the English language, clearly defined and established by immemorial usage. While, at some time not now definitely appearing, the typewritten words "known and unknown" and "injuries, known & unknown" were typed on the face of this instrument, it would seem that no proper "carets" indicate where the same should be inserted, or incorporate these words in the body of the instrument.

The following constitute the definitions of the term "caret" as given by the leading lexiocographers, viz.:

Oxford Dictionary: "Caret. (L. caret (there) is wanting, f. carere to be in want of.) A mark (Λ) placed in writing below the line, to indicate that something (written above or in the margin) has been omitted in that place. * * * Lowell Study Wind. (1886) 301 Like the carets on a proof-sheet."

New Standard Dictionary: "A sign (Λ) placed below a line, indicating where omitted words, letters, etc., should be inserted: sometimes inverted (V) and above the line (L., there is wanting, 3d per. sing. pres. ind. of careo, want)."

Century Dictionary and Cyclopedia: "Caret. (< L. caret, there is wanting, 3d pers. sing. pres. ind. of carere, want, lack; see carency.). A mark (∧) used in writing, in correcting printers' proofs, etc., to indicate the proper place of something that is interlined or written in the margin."

Webster's New International Dictionary (2d ed.) : "L. caret there is wanting, fr. carere to want.) A mark (∧) used by writers and proofreaders to indicate that something interlined above or inserted in the margin belongs in the place marked."

As thus properly presented, courts will take judicial notice of the "caret" and the function it performs, and conform thereto. Thus, in *Rex v. Davis*, 32 E. C. L. Rep. 634, where there was an attack on an indictment which was interlined, as follows:

of the price of one pound, and one
"One ewe ∧ sheep of the value of one pound," the court held: "If an indictment have an interlineation, and have a caret at the proper place where the interlined words are to come in, the court will take notice of the caret and read the indictment correctly." See, also, 9 C. J. 1292. But, we find no authority to extend such judicial recognition to the characters employed in the document now before us. However, assuming that the five typewritten words are, so far as form is concerned, to be deemed regularly interlined, the situation in this jurisdiction, in view of the challenge to the authenticity of this document, invokes the application of these rules:

"Where a written instrument shows upon its face a material and obvious alteration, the presumption of law is that such alteration was made before. the instrument was finally executed and delivered." *Dorsey v. Conrad*, 49 Neb. 443, 68 N. W. 645. See, also, *Nathan v. Jensen*, 110 Neb. 283, 193 N. W. 715.

"Such an instrument may go in evidence in the first instance, leaving the parties to such explanation of the alteration as they may choose to offer." *Dorsey v. Conrad*, *supra*. See, also, *Nathan v. Jensen*, *supra*.

On the subject of the condition of the release in suit at the time it was signed by plaintiff Collins, Maurine Moad, whose name appears thereon as an attesting witness, says: "Q. Did you observe the release at the time that you signed it? A. I just looked over it, I did not read it. Q. Do you know whether or not the fine print was in there, 'or any known or unknown,' at that time? A. No; I don't think that was there at all. Q. It is in here now; you would not say for sure whether it was there or not? A. No; but I don't think it was."

"The value of testimony where the witness refuses to testify positively to the facts, is for the jury to determine, and will vary with the surrounding circumstances and the manner and appearance of the witness." 14 Encyclopedia of Evidence, 142.

In the application of this rule, the supreme court of New Hampshire, in *Hoitt v. Moulton,* 21 N. H. 586, said:

"In another deposition there was the following interrogatory and answer: 'What did you learn from the plaintiff and your sister after this interview?' Answer: 'I think she said he was at liberty to go where he pleased.' This was objected to, but admitted; and, we think, rightly so. Witnesses are not required to give their testimony with absolute positiveness. Were such the case, many of the most truthful and reliable men would be wholly excluded from testifying in a court of justice. They are frequently timid lest they may overstep the bounds of truth, and in narrating their evidence almost always do it with much caution. Witnesses are not required to speak with such confidence as to exclude all doubt in their minds. If the fact is impressed on the memory, but the recollection does not rise to positive assurance, it is still admissible to be weighed by the jury. And on any subject to which a witness may testify, if he has any recollection at all of the fact, he may express it as it lies in his memory, of which the jury will judge. 1 Greenl. Ev. sec. 440. In *Snell v. Moses,* 1 Johns. 99, 103, a witness being called to prove a conversation with a party, said he could not recollect the

expressions used, but would give his impressions as to the substance of the conversation. This mode of giving the conversation was objected to, but held admissible.

"The qualifying words, 'I think,' used by this witness, are of frequent occurrence in the trial of cases. Sometimes, when uttered by an honest, careful man, they detract nothing from the weight of his testimony; while, at others, they are thrown in by dishonest witnesses as a kind of supposed antidote to their perjury. But a witness is as liable to an indictment and conviction for perjury by using these words in connection with his statements, as though he gave his testimony directly and positively. So, also, if he express his belief or understanding of a matter. *Maxwell v. Warner*, 11 N. H. Rep. 568; *Eaton v. Rice*, 8 N. H. Rep. 378; *Pedley's Case*, 1 Leach Cr. Cases, 325; *Miller's Case*, 3 Wils. 427; *Riggs v. Tayloe*, 9 Wheat. 486. It is always desirable that witnesses speak with as much distinctness, directness, and positiveness, as the truth will permit; but absolute assurance is by no means necessary in order to make the evidence admissible."

The oral evidence as to what occurred when this "release" was obtained is without substantial dispute. It is, epitomizing substantially, that one Gustafson came to plaintiff's house; told plaintiff that he had been to see Dr. Parsons, who treated plaintiff the day the injuries were received; that Dr. Parsons had said that plaintiff was not seriously hurt; that he, Gustafson, would pay plaintiff for his damaged pipe, his injured watch, and his doctor's bill, allowing him $15 therefor, but would not pay him for any bodily injuries; that they did not pay damages to his person. Plaintiff's testimony is that he relied on the statements of Dr. Parsons communicated to him by Gustafson; that he did not then know of anything wrong with himself except superficial injuries, and signed the instrument as then prepared by Gustafson, without reading it or having the same read to him. There is also evidence that plaintiff was sitting up in bed at the time the release was executed; that he was then suffering pain, and was then in

a weakened condition. One of the issues of fact, as to which this evidence is pertinent, is whether in this case there is or was a contract in writing embodying a contract of settlement, and whether the instrument under which defendants claim actually constituted such contract of settlement. Under the circumstances of this case, it would have been erroneous to have excluded parol evidence bearing on that issue, on the assumption that in this case such a writing exists and is evidenced by the release already set forth herein.

In addition, the evidence in the record fairly establishes that plaintiff's injuries, at the time this release was obtained by Gustafson, were of a permanent nature, and so serious in character, and so disproportionate to the amount actually paid as a claim for compensation therefor, as to clearly support, as a matter of fact, an inference of mutual mistake or fraud.

Therefore, in the instant case, as there were presented in the record all the facts surrounding and attending the actual execution of the release in controversy, this removes the presumption that the alterations appearing on the instrument were made before its execution, and the question as to how, or when, or with what motive the alterations were made and the five typewritten words inserted was for the triers of fact to determine under all of the evidence. *Nathan v. Jensen*, 110 Neb. 283, 193 N. W. 715.

Viewing the facts detailed in the present record in the light most favorable to defendants, still the circumstances involved invoke this rule, viz.: "When the amount received in settlement is grossly inadequate to compensate for the injuries sustained, that fact may be considered, with other evidence, as tending to show unfair practice, that the party has been overreached, and that the minds of the parties never met in the consummation of a valid contract." *Perry v. Omaha Electric Light & Power Co.*, 99 Neb. 730, 157 N. W. 921.

At the same time, evidence is presented, which, though controverted in part, would, if believed, require the appli-

cation of the following principle: Where parties fairly and honestly intend to and do settle their controversy for known injuries received, but there are injuries wholly unknown to the parties, of a serious character, which are not taken into consideration, a release given in settlement of the injuries, although purporting to be a release of all damages that may thereafter accrue, will be set aside, on the ground of mutual mistake, as inequitable, unjust, and not complying with the intention of the parties. *Simpson v. Omaha & C. B. Street R. Co.,* 107 Neb. 779, 186 N. W. 1001; *Baumann v. Hutchinson,* 124 Neb. 188, 245 N. W. 596; 53 C. J. 1268; *Nygard v. Minneapolis Street Ry. Co.,* 147 Minn. 109, 179 N. W. 642; *McIsaac v. McMurray,* 77 N. H. 466, 93 Atl. 115, L. R. A. 1916B, 769; *Reddington v. Blue & Raftery,* 168 Ia. 34, 149 N. W. 933; *Ostegaard v. Adams & Kelly Co.,* 113 Neb. 393, 203 N. W. 564; *Richardson v. Chicago, M. & St. P. Ry. Co.,* 157 Minn. 474, 196 N. W. 643.

Nor can defendants' contention in this case that plaintiff may not sustain his action until he has tendered back the $15 he received be conceded. It appears that "An exception to the rule requiring the restoration of the consideration as a condition precedent to rescission exists in those cases in which the party rescinding would be entitled to retain the money or property received, even though the compromise be set aside, or where the payment was a gratuity or related to a part of the cause of action. An offer to return is also unnecessary if the judgment asked for will accomplish that result, or where plaintiff is not suing to rescind the new agreement, but his action is on his original demand." 12 C. J. 356.

In addition, Restatement, Contracts, sec. 480, states the controlling rule, as follows:

"(1) The power of any party * * * to avoid a transaction for fraud or misrepresentation is conditional on an offer * * * to return the amount of any money * * * received by him, except as stated in subsection (2). * * *

"(2) A failure to return * * * performance received in

accordance with the rule stated in subsection (1) does not preclude avoidance if the performance * * * (c) is merely money paid, the amount of which can be credited in partial cancelation of the injured party's claim, or * * * (e) constitutes a comparatively small part of the whole consideration," etc.

It thus appears that in all material respects the procedure followed by the trial court, at least until the receipt of the jury's verdict, merits our approval. As returned by the jury this verdict awarded the plaintiff a recovery of $15,000 for the damages in suit. This the defendants in their motions for new trial attack as being excessive in such a degree as to sustain the conclusion that it was the result of prejudice and passion. To set forth the evidence in the record pertaining to this subject would not only unduly lengthen this opinion, but would serve no purpose. However, a careful consideration of plaintiff's history, his age, his general health, his physical condition, his capacity to work and earn, both before and after the accident, and keeping in mind the suffering occasioned thereby, as reflected in the record of this case as submitted, clearly establishes that in arriving at the amount of their verdict the trial jury failed to respond truly to the real merits of the controversy submitted to them, and manifestly erred. The amount of $15,000 awarded by this verdict is clearly excessive in such a degree as to necessarily induce the belief that it must have been found and determined through and because of passion, prejudice, or mistake, or some means not apparent in the record. The district court, therefore, erred in overruling defendants' motions for a new trial based on this fact, in requiring a remittitur of $10,000, and in the entry of a judgment for $5,000 upon such verdict.

Our Bill of Rights (Const. art. I, sec. 6) prescribes: "The right of trial by jury shall remain inviolate." In the matter of fixing the amount of damages inflicted by them the defendants have not been accorded a fair trial by jury. This error was not cured by the order of the trial

court requiring a remittitur of 66 2/3 per cent. of the amount of the verdict returned. "A verdict so clearly wrong as to induce the belief on the part of the reviewing court that it must have been found through passion, prejudice, mistake, or some means not apparent in the record, will be set aside and a new trial awarded." *Garfield v. Hodges & Baldwin,* 90 Neb. 122, 132 N. W. 923. See, also, *Trute v. Holden,* 118 Neb. 449, 225 N. W. 238; *Schafer v. Missouri Valley Pipe Line Co.,* 123 Neb. 669, 243 N. W. 889; *Watson v. Miller,* 131 Neb. 74, 267 N. W. 230.

Solely because of the excessive verdict returned, and the inferences established thereby, the judgment of the district court is reversed and the cause remanded for further proceedings in harmony with this opinion.

REVERSED.