JOSEPH J. VAVRICKA, APPELLEE, V. MID-CONTINENT
COMPANY, APPELLANT.

8 N. W. (2d) 674

FILED MARCH 26, 1943.   No. 31435.

*Littrell & Patz* and *Frank D. Eager,* for appellant.

*Ira D. Beynon, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

CARTER, J.

This is an action at law to rescind a contract for the purchase of corporate stock because of fraud and to recover the purchase price. The jury returned a verdict for $1,527.60, for which amount judgment was entered. The defendant Mid-Continent Company appeals.

On May 5, 1937, plaintiff purchased 120 shares of the capital stock of the defendant company for $1,200. On January 6, 1940, he demanded the return of the purchase price immediately after he claims to have discovered that the sale of the stock to him had been fraudulently made. The defendant first contends that the tender of plaintiff's stock certificate and a dividend check for $6, while retaining $226 received as dividends, was insufficient to support an action for the purchase price.

The general rule is that a party who seeks to rescind a contract must return, or offer to return, the property acquired by the contract within a reasonable time. The purpose of the rule is to prevent enrichment by the rescinding party at the expense of the other party to the contract. There are, however, exceptions to the rule. For instance, "one who attempts to rescind a transaction on the ground of fraud, mistake, or otherwise, is not bound to restore that which he has received by virtue thereof, when, in any event, he is entitled to retain it as indisputably his own whatever may be the fate of his effort to rescind the transaction." 5 Williston, Contracts (Rev. ed.) sec. 1530.

An authoritative text states the rule as follows: "A failure to return or offer to return performance received in accordance with the rule stated in subsection (1) does not preclude avoidance if the performance * * * (c) is merely money paid, the amount of which can be credited in partial cancelation of the injured party's claim * * * ." Restatement, Contracts, sec. 480. We think the rule in this state is in accord with this. The development of the exceptions to the general rule in this state will be found by an exami-

nation of the following cases: *Symns & Co. v. Benner*, 31 Neb. 593, 48 N. W. 472; *Phenix Iron Works Co. v. McEvony*, 47 Neb. 228, 66 N. W. 290; *Collins v. Hughes & Riddle*, 134 Neb. 380, 278 N. W. 888. In the last case cited the court said: "Nor can defendants' contention in this case that plaintiff may not sustain his action until he has tendered back the $15 he received be conceded. It appears that 'An exception to the rule requiring the restoration of the consideration as a condition precedent to rescission exists in those cases in which the party rescinding would be entitled to retain the money or property received, even though the compromise be set aside, or where the payment was a gratuity or related to a part of the cause of action. An offer to return is also unnecessary if the judgment asked for will accomplish that result, or where plaintiff is not suing to rescind the new agreement, but his action is on his original demand.' 12 C. J. 356." While it is true that some of our earlier cases adopted more strict rules in requiring restoration as a condition precedent to the bringing of an action for the purchase price after a rescission of the contract for fraud, the tendency has been toward a less stringent rule in the furtherance of justice between the parties. This has resulted in several well-established exceptions, including the one which we have applied to the case at bar. The exception to the general rule here invoked has been generally adopted as is evidenced by the following cases: *Beverly v. Richards*, 255 Mich. 508, 238 N. W. 270; *Keefe v. Jefferson*, 151 Minn. 368, 186 N. W. 789; *Damerel v. North American Bond & Mtg. Co.*, 133 Cal. App. 290, 24 Pac. (2d) 237; *Kyser v. Southern Bldg. & Loan Ass'n*, 224 Ala. 673, 141 So. 648. For a concise statement of the difference between rescission in equity and law, see *Corse & Co. v. Minnesota Grain Co.*, 94 Minn. 331, 102 N. W. 728.

Consequently, even though the general rule is that a person rescinding a contract for fraud is required to restore whatever has been received under the contract in the way of money, property or other consideration as a condition precedent to an action at law for the recovery of the pur-

chase price, yet, in order to effect justice between the parties, the following exception, among others, has become a part of the law of rescission in this state: Where the party rescinding would be entitled to retain the money or property received, either by virtue of an original liability if the contract be rescinded, or under the contract itself if. rescission be refused, no tender or offer of restoration is required. If, then, the thing to be restored consists of money, the amount of which can be credited in partial cancelation of the injured party's claim, a failure to restore will not preclude a suit to recover the consideration paid. We conclude that the trial court properly held that a sufficient tender was made in the instant case.

The record in this case shows the following: Prior to 1937 one George Vance organized a corporation known as Midwest Company Number One with a capital stock of $25,000. When the stock had been sold he organized Midwest Company Number Two with a capital stock of $25,-000. When the stock in this company had also been sold, a third company known as Midwest Company Number Three was organized with a capital stock of $25,000, and its stock similarly disposed of. The Mid-Continent Company was thereupon organized with a capital stock of $25,000, which authorized capital stock has been increased from time to time until it reached the amount of $250,000 on January 11, 1937. On January 31, 1937, the three Midwest companies were consolidated with the Mid-Continent Company, the defendant herein. On December 14, 1936, Vance also organized the Mid-Continent Sales Company with an authorized capital stock of $5,000, and on December 29, 1937, the Royalty Purchasing Company was also incorporated with an authorized capital stock of $10,000. The purpose of the three Midwest companies and the Mid-Continent Company, with which they were later consolidated, was to engage in the purchase of oil royalties for profit. The purpose of the Mid-Continent Sales Company was to sell the stock of the Mid-Continent Company and any stock or securities of which they might become possessed by trading Mid-Conti-

nent Company stock therefor. The purpose of the Royalty Purchasing Company was to engage in the buying of oil royalties in Oklahoma, Texas, Kansas and other oil producing states primarily, we think the evidence shows, for resale to the Mid-Continent Company at a marked up price.

The record further shows that all of these corporations maintained their offices at the same location. That Vance participated in the organization of all these corporations is established. He was the president of all of them. The other incorporators of the Mid-Continent Company were B. V. Foster, E. E. Erskine and G. P. Fair, all of whom had been connected with the three Midwest companies prior to their consolidation with the defendant company. The incorporators of the Mid-Continent Sales Company were E. M. Sanmann, Georgia P. Fair and E. E. Erskine, the latter two of whom were officers of the Mid-Continent Company.

The plaintiff alleges, and there is evidence to sustain the allegations, that on May 5, 1937, the Mid-Continent Company, through its agents, in order to induce plaintiff to purchase 120 shares of its capital stock, represented to plaintiff that the Mid-Continent Company was a good, sound and substantial company whose stock had a value of $10 per share and would soon be valued at $12.50 per share, that the stock was earning in excess of 10 per cent. per annum, and that a reserve was being maintained for the repurchase of the company's stock whenever plaintiff desired to sell. It was also represented that the expenses of the corporation did not exceed 5 per cent. of the income of the company and that the men in control of the company were experienced oil men. Plaintiff contends that these representations were all false.

The evidence shows that the Mid-Continent Company paid a 20 per cent. commission for the sale of its stock, which resulted in a total expenditure as of May 7, 1937, of $26,913.50 for organization and stock-selling expense. No reserve was established to wipe out this impairment of capital. The evidence also shows that all of the royalties purchased by the Mid-Continent Company were bought from

the Royalty Purchasing Company, or George Vance, at an amount much in excess of their cost. The evidence reflects that the Mid-Continent Company paid approximately $20,-000 more for the royalties owned by it on May 7, 1937, than the Royalty Purchasing Company or Vance paid for them, although the money used was on all occasions that of the Mid-Continent Company. The evidence further shows that the dividends paid out by the defendant company exceeded the income of the company as of February 28, 1941, by $12,653.18, some part of which not shown by the record amounted to an impairment of the capital stock of the company prior to May 5; 1937. It is further shown by the record that oil royalties are depleting assets requiring, as a matter of good business, the setting up of a reserve in excess of 25 per cent. of the annual income from the royalties to implement the capital assets of the company when they no longer produce a profit. As of May 7, 1937, the total of the items amounting to deductions from capital assets including selling expense and organization, cost of royalties over and above the cost to Vance or the Royalty Purchasing Company, the depletion of royalties and the deficit shown by the books of the company, was $53,564.74. At the same time the companies' assets amounted to $154,570.10. It can readily be seen that this evidence indicates a capital impairment of more than one-third of the capital assets of the company on the day that plaintiff purchased his stock. It is true that there is expert evidence in the record that the royalties held by the Mid-Continent Company on May 7, 1937, were worth from $275,000 to $300,000, even though the market value in Tulsa, Oklahoma, the place where most of the royalties were purchased, was from $87,000 to $90,-000. The evidence shows that the dividends paid out exceeded the company's earnings and that it was not in fact earning annual dividends of 10 per cent. as represented. The evidence further shows that no reserve was set up for the repurchase of any of the company's own stock as represented to the plaintiff. It is further shown that the 5 per cent. of income deducted for expenses did not cover all

the expenses of the company, especially the expense connected with the purchase of royalties which was paid in the form of a profit to the Royalty Purchasing Company, or Vance, as the case might be. It was further disclosed from the record that the officers of the company were not men experienced in the oil business. In fact, it is shown that B. V. Foster was Beulah V. Foster, the mother of George Vance, that E. E. Erskine was Elva E. Erskine, a stenographer in the office, and that G. P. Fair was Georgia P. Fair, a beauty shop operator and friend of Vance. There is no attempt made to show that any of these three officers of the company had any knowledge of the business of handling oil royalties.

The record is replete with evidence that J. F. Sanmann, the salesman who sold the stock to plaintiff, was closely associated with Vance and the various companies organized by him. In fact, Vance was one of the organizers and the president of the Mid-Continent Sales Company of which Sanmann was a former officer and the agent who sold the stock to plaintiff. We think the evidence was such that it was for the jury to appraise the whole situation and determine whether the alleged representations were made, whether or not they were true, whether the representations were relied on to plaintiff's damage, the relationship of the parties to the whole transaction and the intent with which the acts complained of were done. These questions have been resolved favorably to the plaintiff and we think the evidence is ample to sustain the finding of the jury.

The defendant company contends that it is not chargeable with the independent conduct of its officers while engaged in a fraudulent scheme for private profit adverse to the best interests of the company. The fraud complained of, however, was that perpetrated by the company when it, through its agents, sold the stock to the plaintiff. The representations made by Sanmann and those contained in the prospectus were the ones which rendered the contract voidable for fraud. We think that the manner of operation of the Mid-Continent Sales Company in having the same office,

the same officers, and the same domination by Vance as the Mid-Continent Company, indicates that the Mid-Continent Sales Company was the agent of the Mid-Continent Company in the sale of its stock and that representations made by it through Sanmann, its stock salesman, were those of the Mid-Continent Company. Defendant contends that Sanmann was not authorized to make the representations regarding the financial standing and methods of operation of the company. We think he was. In *Jacobson v. Skinner Packing Co.*, 118 Neb. 711, 226 N. W. 321, we said: "Defendant claims that there was no proof that the company had authorized its salesman to make the alleged misrepresentations and had no knowledge that they had been made, and therefore the defendant company is not liable in an action for deceit or fraud of the agent. The company had employed the salesman to solicit and receive subscriptions for stock. The natural inquiry of a proposed purchaser would be directed to the condition and situation of the company, its officers and promoters, the kind of business proposed to engage in, the profits, and like questions. To give such facts was necessarily incumbent on the salesman and was strictly in the line of his duties, and the company is responsible for any misrepresentations in an action for fraud and deceit."

In *Griffin v. Bankers Realty Investment Co.*, 105 Neb. 419, 181 N. W. 169, we also said: "We recognize the application of the law as laid down in *Joyce & Co. v. Eifert*, 56 Ind. App. 190, wherein it was held: 'Whenever an agent of a corporation duly authorized to procure subscriptions to its capital stock, induces persons to subscribe to shares of such stock by fraudulent representations or concealments, any person so defrauded will be entitled to a rescission of the contract in the same manner and to the same extent as between two natural persons.'"

Clearly, if Sanmann was the agent of the Mid-Continent Company, as the jury found, he was authorized to make the representations as to its financial status and its methods of operation.

The defendant also contends that plaintiff failed to establish that he believed and relied upon the statements made by Sanmann. The record contains many statements of the plaintiff that he believed the representations made and that he would not have purchased the stock otherwise. It is true, as alleged by the defendant, that plaintiff entered into a repurchase agreement whereby Sanmann agreed to repurchase the stock if plaintiff should need his money within twelve months and that plaintiff, on being asked on cross-examination if this repurchase agreement was not the sole and only inducing factor that caused him to purchase the stock, answered in the affirmative. If plaintiff in buying the stock relied solely upon the agreement of Sanmann to repurchase, as this one answer indicates, it would disprove his claim that he relied upon the representations made concerning the quality of the stock. The record shows, however, that this was an answer given during several hours of testifying. No particular point was made as to the use of the words "sole and only inducing factor." It must be treated as an isolated statement which the jury were entitled to consider in connection with other evidence on the question of the reliance of the plaintiff on the representations made.

It is urged that the representations made were not actionable because they constituted mere sales talk and the agent's opinion as to their value. Defendant cites *Leichner v. First Trust Co.*, 133 Neb. 170, 274 N. W. 475, which holds as follows: "Under the circumstances shown in the record, one could not reasonably find that Suffa at the time of the sale of the bonds involved knew that the representations alleged, assuming that any or all of them were made, were false, or that such representations were made as positive statements without knowledge of whether or not they were true. To say that the bonds were as 'good as gold' and that the security for their payment was 'good' could not reasonably be construed in this case to amount to more than the expression of an opinion relating to value. Actionable fraud may not be predicated upon the expression

of a mere opinion as to value honestly made, under circumstances that do not give another the right to rely thereon. * * * The evidence does not show that Suffa knew that any of said representations were untrue. He made no statement importing knowledge on his part. For aught that the record shows, he had full knowledge of all facts existing at the time the bonds were sold."

But the situation recited in the *Leichner* case does not exist here. The agent Sanmann made positive representations concerning the quality of the stock. Among others, he represented that the officers of the company were men of experience in the oil royalty business, that the company had earned 10 per cent. dividends every year, that the expense of the corporation was limited in a manner attractive to stock purchasers and that a reserve had been established which would entitle plaintiff to sell his stock to the defendant company at any time after one year at its liquidating value, all of which proved to be untrue. We think these were positive representations of fact upon which plaintiff could rely and which were calculated to mislead and deceive the plaintiff. They do not constitute sales talk or puffing in the sense which the law implies.

It is further urged that plaintiff has failed to prove that he has been damaged. The evidence heretofore recited was sufficient to take that question to the jury. The impairment of capital assets heretofore shown is sufficient to sustain a finding that the stock was not of the value represented at the time it was sold to the plaintiff.

Defendant complains of alleged errors in the instructions and of the court's refusal to give certain instructions tendered by it. We have examined all of the alleged errors pertaining to the instructions and have concluded that they fairly presented all of the issues to the jury. As a whole, they correctly state the law and fairly present the issues. No error prejudicial to the defendant has been found.

AFFIRMED.

Rose and Eberly, JJ., not participating.

Messmore, J., dissenting.

I respectfully dissent from that part of the opinion with reference to tender. This is an action at law to rescind a contract for the purchase of stock. The general rule is stated in *Building & Loan Ass'n of Dakota v. Cameron,* 48 Neb. 124, 66 N. W. 1109, as follows: "It has been often held, and may be regarded as elementary law, that one who seeks to rescind a contract on the ground of fraud must offer to return the property or consideration received therefor by him, provided it be of any value, within a reasonable time." Citing *Clark v. Tennant,* 5 Neb. 549; *Brown v. Waters,* 7 Neb. 424; *Babcock v. Purcupile,* 36 Neb. 417, 54 N. W. 675. This rule has not been departed from by this court.

The petition in the instant case (and it is important) alleged, in substance, the purchase of 120 shares of stock on May 5, 1937, the fraud and discovery thereof, and an offer to return the stock certificate and one dividend of $6. The prayer was for judgment in the amount of $1,200, with interest at 6 per cent. from May 7, 1937. Plaintiff retained $226 dividends, received under the certificate, which he did not in his petition offer to tender back to the defendant. Upon the trial, and on November 17, 1941, plaintiff renewed his offer made January 6, 1940, which was an offer to return the stock certificate and one 6-dollar dividend, and, in addition, for the first time offered to return all dividends received and interest thereon, then amounting to $272. The latter tender was objected to as not being within a reasonable time; that the plaintiff for two years affirmed that part of the contract beneficial to him, thus having the use and benefit of the dividends during that time. The facts developed that plaintiff's demand upon the company was for the return of $1,200, plus interest from May 7, 1937, to January 6, 1940, or $192, making a total of $1,392. The petition and prayer of the petition verify this statement. The proper tender was to offer the return of the certificate of stock, dividends received thereon, plus interest received under the contract; then demand the $1,200, evidencing the certificate of stock, with interest at 6 per cent. to the date

of tender, as·prayed in the petition. At the date of tender plaintiff's dividends exceeded by $34 the 6 per cent. interest on the $1,200. In other words, there was never at any time a tender that would place the parties *in statu quo*, or in the same position they were in before the contract was made, the plaintiff at all times having received more from the defendant than he ever offered to return.

In the case of *Alfree Mfg. Co. v. Grape,* 59 Neb. 777, 82 N. W. 11, this court held:

"A pleading for rescission of a contract for a breach in its conditions must allege the ground upon which a right to rescind is based—an offer to rescind without unnecessary delay by a tender of the property received, with a request for a return of the consideration. The offer to return the property must be continuous, and kept good by a proper averment to that effect.

"A contract cannot be rescinded in part and a part remain executed. If rescinded at all, it must be *in toto,* and the parties thereto placed *in statu quo* so far as the circumstances will permit."

Suffice it to say that plaintiff's petition did not make the proper tender as by law required. The tender must be a condition precedent to a law action to rescind a contract for the purchase of stock. The foregoing rule has been the law in this state and has been announced by the Massachusetts court, which has been cited and approved by the decisions of this court. The case of *Loomis v. Pease,* 234 Mass. 101, 125 N. E. 177, was based on rescission of a contract for purchase of stock. Plaintiff offered to return the stock before filing suit but did not offer to return the dividends received. The court said (p. 107):

"To recover under this count (rescission) the plaintiff must have disaffirmed the contract and restored to the defendant the benefits derived therefrom. He must have done everything within his power to return to the defendant the property received and restore him to the same condition as before the contract was made."

In the case of *Rasmussen v. Hungerford Potato Growers*

*Ass'n,* 111 Neb. 58, 195 N. W. 469, this court said: "Immediately upon learning the facts he (plaintiff) should announce to his adversary that he does not intend to be bound by the terms of the agreement made, and tender back what he has received under it. To maintain rescission at law, he must do this at or prior to the time of the commencement of his action. Due allegation of his acts of rescission should be made in the petition. *Alfree Mfg. Co. v. Grape,* 59 Neb. 777; *Pollock v. Smith,* 49 Neb. 864; *First Nat. Bank v. McKinney,* 47 Neb. 149; *American Bldg. & Loan Ass'n v. Rainbolt,* 48 Neb. 434; *Baker v. Thomas,* 102 Neb. 401; *First Nat. Bank v. Yocum,* 11 Neb. 328; *Symns & Co. v. Benner,* 31 Neb. 593."

The rule of practice is too well established to be gainsaid in cases where objection is made as in the case at bar. It is a most salutary rule, having its basis in truth and natural justice. The *Rasmussen* case was cited with approval by Circuit Judge Kenyon in *Albert Lea Foundry Co. v. Iowa Savings Bank,* 21 Fed. (2d) 515. The foregoing rule has been the rule in this state, adopted by this court, throughout its history since the case of *Clark v. Tennant,* 5 Neb. 549, down to the case of *Aron v. Mid-Continent Co.,* 141 Neb. 806, 4 N. W. (2d) 884.

The majority opinion eliminates consideration of the pleadings which is equivalent to saying: Regardless, the facts in this case come within the exception to the rule; then announces the exception as follows: "Where the party rescinding would be entitled to retain the money or property received, either by virtue of an original liability if the contract be rescinded, or under the contract itself if rescission be refused, no tender or offer of restoration is required. If, then, the thing to be restored consists of money, the amount of which can be credited in partial cancelation of the injured party's claim, a failure to restore will not preclude a suit to recover the consideration paid."

Aside from the text and citation, Restatement, Contracts, the opinion cites *Symns & Co. v. Benner,* 31 Neb. 593, 48 N. W. 472. The facts in that case were: "Symns sold

goods to Benner on the representation that Benner was entirely free from debt; that the goods in his store were paid for, and he was in the habit of discounting his bills and would pay the same within 10 days, whereupon goods to the amount of $500 were sold to him by Symns. In 10 days from the date of purchase Benner paid $100, and soon afterwards executed a mortgage for a large amount to his brother and surrendered possession thereunder of his goods. Attachments were thereupon levied upon the goods, whereupon Symns brought an action in replevin to recover the goods previously sold by him, and on the trial paid into court the amount of money paid by Benner under the purchase, less the amount of goods sold by Benner. It was held that, as there was uncertainty as to the amount of goods sold by Benner, and as the offer to pay the $100 residue was made on the trial, and as soon as the amount was ascertained, it was within a reasonable time. The above decision naturally falls within the exception and is based upon the proposition that the person guilty of the fraud has put it out of the power of the party defrauded to make such return; that is, a return *in toto*. In the case at bar this situation did not arise. The party guilty of fraud has not put it out of the power of this plaintiff to make a return *in toto*, and no exception is made because it constitutes a return of money.

The case of *Phenix Iron Works Co. v. McEvony*, 47 Neb. 228, 66 N. W. 290, is cited: The court held, with reference to the tender: "When a vendor seeks to rescind a sale for fraud he must return or offer to return any portion of the purchase money which he may have received; but he need not do so when the property has been damaged by the fraudulent vendee to an amount equal to the purchase money so received." The above case likewise meets the exception and is not analogous to the case at bar.

*Collins v. Hughes & Riddle*, 134 Neb. 380, 278 N. W. 888, is cited. This was a damage action for personal injuries received by the plaintiff by virtue of an automobile accident, based on negligence of the defendant. A release had

been procured by defendant for $15 in complete settlement. The case proceeded to trial on the negligence of the defendant. A verdict for $15,000 was returned for the plaintiff; a remittitur of $10,000 was required, and the case was remanded for the reason that the verdict was excessive and constituted prejudicial error. The release was set aside, and the exception to the rule, as heretofore announced, was stated.

The instant case is one to rescind the purchase of a certificate of stock, wherein the purchase was induced by fraud, and does not admit of the exception, and never has until the decision in the instant case. There are no other Nebraska cases cited in the majority opinion to sustain the exception, and it is respectfully submitted that the foregoing cases are not authority for the application of the exception to the facts in the instant case. The mere statement of the exception refutes itself for the reason that the dividends the plaintiff received were under, and by right created by, the contract. To effectuate a rescission of this contract is to destroy it and all rights created under it, including the right to retain the dividends received. When counsel argues that the contract is rescinded, plaintiff has no remaining right, in any event, under the contract and especially any right to keep the benefits except by affirmance of the contract. The phrase, that "one need not offer to return that which he would be entitled to keep in any event," has its origin in a different branch of the law,— compromise and settlement, accord and satisfaction, or where the property sold has been damaged or placed beyond the power of the defrauded party to make a tender *in toto.* The effect of rescission is to extinguish the contract so effectively that, in contemplation of law, it never had had any existence. It puts an end to the contract for all purposes. Primarily, it is a rescission of an agreement to purchase stock, to put the parties in the same position they were prior to making the contract. 12 Am. Jur. 1038, sec. 455. To permit the rescinding party to retain one species of property received under the contract, and not all the

property of value, does not create an exception, but is to ignore and destroy a well-established rule of law.

The plaintiff in the instant case does not come within any of the legitimate exceptions to the rule. The property retained by him had value; its return was entirely possible. With the question of fraud, as presented in the instant case, I have no quarrel. It is my purpose to sustain a salutary rule of law and not to promiscuously create an exception to it and, in fact, adopt the exception as a rule of law, to govern this court in future cases involving a law action to rescind a contract for the purchase of stock. While this rule might do violence in some cases, it has been proved to be a definite, clear and salutary rule in a majority of cases involving a law action of this kind.