ADAMS BANK & TRUST, APPELLANT, V. EMPIRE FIRE AND MARINE INSURANCE COMPANY, APPELLEE.

455 N.W.2d 569

Filed May 25, 1990.ʹ No. 88-455.

Tanya L. Dillow, of McGinley, Lane, Mueller, O'Donnell & Williams, P.C., for appellant.

Terrance O. Waite, of Murphy, Pederson, Piccolo & Pederson, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

The plaintiff, Adams Bank & Trust, brought this action against the defendant, Empire Fire and Marine Insurance

Company, to recover on a motor vehicle dealer's bond issued to Fuller Motor Co., Inc. (Fuller), by the defendant.

Fuller operated an automobile dealership in Ogallala, Nebraska. The plaintiff financed Fuller's used-car operation through a floor plan arrangement. The security agreement between Fuller and the plaintiff provided that Fuller would "deliver to Bank, promptly upon receipt, all proceeds of its inventory received by Borrower (except goods) . . . in the exact form in which they are received . . . ." The plaintiff held the certificates of title for the vehicles financed under this arrangement, and the plaintiff's lien on each vehicle was noted on the certificate of title for the vehicle.

David L. Christensen, an officer of the plaintiff, testified that when the proceeds from the sale of an automobile were turned over to the plaintiff, the dealer's note would be reduced by the amount that had been floor planned, the lien on the certificate of title would be released, and the certificate of title would be delivered to the dealer.

The plaintiff monitored the vehicles which it floor planned through periodic inventory inspections.

In March 1985, the bank suspected that Fuller had sold some vehicles "out of trust"—a failure to pay the indebtedness on a vehicle sold—and called Fuller's line of credit, demanding payment of the debt in full. When payment was not made, the bank applied the balance in Fuller's checking account in the amount of $39,695.96 to the debt on April 10, 1985.

There were six vehicles which had been floor planned for a total of $46,100 that were sold out of trust. The plaintiff did not release the titles to the vehicles until June 6, 1985.

Norman K. Fuller, the owner of Fuller, testified that he had done business exclusively with the plaintiff for 17 years and that it was routine practice for the proceeds from the sales of motor vehicles to be deposited in the dealership account rather than be paid directly to the bank. The plaintiff admitted that it had permitted this course of conduct and that it would occasionally be 5 to 6 weeks between the time that a vehicle was sold and the time that the certificate of title to that vehicle was released.

The trial court found that all funds obtained from the sale of the vehicles in question had been deposited in Fuller's account

with the bank and that there was no evidence that any proceeds from the sales went anywhere other than to the plaintiff.

The bond at issue in this case was obtained pursuant to Neb. Rev. Stat. § 60-1419 (Reissue 1988), which provides:

> Applicants for a motor vehicle dealer's license, trailer dealer's license, or motorcycle dealer's license shall, at the time of making application, furnish a corporate surety bond in the penal sum of . . . twenty-five thousand dollars . . . on a form to be prescribed by the Attorney General of the State of Nebraska. The bond shall provide (1) that the applicant will faithfully perform all the terms and conditions of such license, (2) that the licensed dealer will fully indemnify any person or other dealer by reason of any loss suffered because of (a) the substitution of any motor vehicle or trailer other than the one selected by the purchaser, (b) the dealer's failure to deliver to the purchaser a clear and marketable title, (c) the dealer's misappropriation of any funds belonging to the purchaser, (d) any alteration on the part of the dealer so as to deceive the purchaser as to the year model of any motor vehicle or trailer, and (e) any false and fraudulent representations or deceitful practices whatever in representing any motor vehicles or trailer, and (3) that the motor vehicle, motorcycle, motor vehicle auction, or trailer dealer or wholesaler shall well, truly, and faithfully comply with all the provisions of his or her license and the acts of the Legislature relating thereto. The aggregate liability of the surety shall in no event exceed the penalty of such bond.

The plaintiff claims that Fuller misappropriated funds belonging to purchasers and that it is entitled to recover under § 60-1419(2)(c). The trial court found that the bank had offset all funds in Fuller's account and should not be allowed to claim that the continuing practice of selling vehicles and depositing funds in the account constituted misappropriation. The plaintiff's assignment of error is that the trial court erred in failing to find that the plaintiff was entitled to recover on the bond.

In *Havelock Bank v. Western Surety Co.*, 217 Neb. 560, 352 N.W.2d 855 (1984), we held that a bank can recover on a motor

vehicle dealer's bond if it can prove that it sustained a loss as a result of the dealer's breach of one of the conditions of the bond. In *Sun Ins. Co. v. Aetna Ins. Co.*, 169 Neb. 94, 98 N.W.2d 692 (1959), and *Sterner v. Lehmanowsky*, 173 Neb. 401, 113 N.W.2d 588 (1962), we stated that persons in addition to purchasers of automobiles are protected under the bond against loss resulting from misappropriation of funds belonging to the purchasers.

In the *Havelock Bank* case, the evidence showed that the dealer had sold a car to which the Havelock Bank held title under a floor plan arrangement and deposited the proceeds from the sale in an account in a California bank. When the Havelock Bank requested the proceeds from the sale, the dealer said that another car was to be sold and that the Havelock Bank would be paid after the second car had been sold. The Havelock Bank, however, was never paid for the car.

In this case, the security agreement required Fuller to "deliver to Bank, promptly upon receipt, all proceeds of its inventory received by Borrower . . . in the exact form in which they are received . . . ." Although the proceeds from the sales of the six used vehicles may have been deposited in Fuller's account in the plaintiff bank, there is no evidence that Fuller had requested the certificates of title to the vehicles or in any other way notified the plaintiff that the vehicles had been sold and funds in its account should be applied to satisfy the liens which the plaintiff held on the vehicles so that the certificates of title could be released to Fuller. The balance remaining in Fuller's account on April 10, 1985, was less than the amount of the liens on the six vehicles that had been sold "out of trust" by Fuller. This established that some of the proceeds from the sale of the six vehicles had been misappropriated by Fuller because the proceeds had been applied to something other than payment of the liens on the vehicles.

So far as the evidence in this case shows, Fuller's account in the plaintiff bank was a general account in which funds from the operation of the business were deposited and out of which expenses from the operation of the business were paid. In other words, the evidence does not show, and the defendant does not claim, that only proceeds from the sale of Fuller's used cars on

which the plaintiff had a lien were deposited in the account and that the account was used only to pay to plaintiff the amount of the liens which the plaintiff had on used cars floor planned by Fuller. Thus, the deposit in Fuller's account of the proceeds from the sale of used cars on which the plaintiff had a lien was not a payment of the lien without some notice to the plaintiff by Fuller that the funds should be used for that purpose. Under the facts in this case, the result is the same as if Fuller had deposited the proceeds from the sale of its used vehicles in a bank other than the plaintiff, as was done in the *Havelock Bank* case.

As we said in *Havelock Bank, supra* at 566, 352 N.W.2d at 859:

> Proper use of those funds would have entailed payment to the Bank in order to obtain title for the purchaser. UAS, in violation of the security agreement, failed to do so; thus, the Bank suffered a $14,500 loss by reason of this misappropriation of the purchaser's funds.

In this respect, the evidence in this case is somewhat similar to that in *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 406-07, 390 N.W.2d 487, 490 (1986), in which the dealer had received $24,025 from the sale of four vehicles out of trust,

> but never applied those sale proceeds as a payment of either principal or interest on any of his promissory notes pertaining to the vehicles sold. From October 19 to October 28, the highest balance in the checking account for Arntt's Auto Sales was $23,865.57. Between November 12, 1981, and the end of that year, the highest balance in the checking account of Arntt's Auto Sales was $7,951.44. Arntt used sale proceeds from the four vehicles mentioned above for "business ventures other than the used car business."

The evidence in this case established, as a matter of law, that there was a misapplication by Fuller of funds belonging to purchasers of vehicles.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.