ALLIANCE NATIONAL BANK & TRUST COMPANY, A NATIONAL
BANKING ASSOCIATION, APPELLEE, v. STATE SURETY COMPANY, A
CORPORATION, APPELLANT.

391 N.W.2d 487

Filed July 18, 1986.   No. 85-113.

Morris L. Woodruff of Muffly, Oglesby & Brown, for appellant.

Robert M. Zuber of Zuber & Ginsburg, and Mark L. Andersen, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

State Surety Company appeals the $20,000 judgment in favor of Alliance National Bank & Trust Company awarded by the district court for Box Butte County in a bench trial. Alliance National had sued on State Surety's bond indemnifying against "false and fraudulent representations or deceitful practises" of Fred Arntt, the principal of a motor vehicle dealer's bond issued by State Surety.

In a bench trial of a law action, factual findings by a trial court have the effect of a verdict and will not be set aside unless clearly erroneous. See, *Buckingham v. Wray*, 219 Neb. 807, 366 N.W.2d 753 (1985); *Havelock Bank v. Woods*, 219 Neb. 57, 361 N.W.2d 197 (1985). In reviewing a judgment awarded in a bench trial, the Supreme Court does not reweigh evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. See, *H & L Equip. v. Schardt*, 217 Neb. 653, 349 N.W.2d 924 (1984); *Havelock Bank v. Woods, supra*.

State Surety issued a motor vehicle dealer's bond for Fred Arntt, a used-car dealer doing business as a proprietorship,

"Arntt's Auto Sales," in Alliance. That bond had a face amount of $20,000 and indemnified against Arntt's false and fraudulent representations or deceitful practices.

From September 1980 until November 1981, Alliance National provided financing to Arntt in the sales of his used-car inventory. Arntt gave Alliance National his separate promissory note, due "after date," for every inventoried car, as well as a blanket security agreement and financing statement covering Arntt's entire inventory. As a part of the floor plan arrangement with the bank, Arntt delivered to Alliance National all certificates of title for inventoried vehicles, certificates which designated Arntt as the owner. For each of Arntt's promissory notes, "collateral" consisted of the certificate of title for the vehicle described in a particular note. Each certificate of title was attached to Arntt's corresponding note but was later returned to Arntt for completion of an inventoried vehicle's sale. As reflected by 36 transactions occurring between August 1980 and September 29, 1981, Alliance National returned certificates to Arntt, who later paid the bank all indebtedness regarding every vehicle for which the bank had returned the certificate of title to Arntt. In sales of inventoried vehicles before October 1981, the time for Arntt's payment to the bank varied from a minimum of 4 days to a maximum of 102 days. The bank conducted periodic inspections of Arntt's inventory to assure that no vehicle had been sold "out of trust"—a failure to pay the indebtedness on a vehicle sold—and learned that Arntt had sold vehicles covered by the security agreement. After Arntt failed to pay the bank in 1982, Alliance National seized all Arntt's remaining inventory and later filed suit against State Surety for Arntt's alleged fraud.

In its amended petition Alliance National, generally, alleged that Arntt had made misrepresentations to obtain return of the certificates of title and additional credit from the bank, causing damage to the bank in the amount of $20,000.

Richard Bilstein, Alliance National's loan officer in charge of Arntt's account, testified that when each certificate of title was returned regarding a prospective sale, Arntt agreed to pay all indebtedness on each vehicle for which the certificate was

returned, that is, "[i]n every instance, there was definitely a procedure set up as to when the bank would receive [its] money." Over State Surety's objection (hearsay), Bilstein also testified about Arntt's statements made to him as a loan officer for the bank, representations concerning four inventoried vehicles for which the bank was never paid, namely:

1. A 1978 Ford van; balance on note—$5,737. Statement: On October 19, 1981, Arntt said the van was involved in a sale at North Platte and that certificate of title was needed to "close the deal" regarding the North Platte sale. Fact: The van had been sold on October 14, and Arntt received sale proceeds of $4,775 and a Chevrolet Blazer trade-in. The Blazer trade-in was later sold on October 26 for $2,500.

2. A 1979 Chevrolet Luv; balance on note—$4,500. Statement: On October 19, 1981, in conjunction with the sale of the 1978 Ford van, Arntt stated that when the van and Chevrolet Luv were sold, the bank would be paid. Fact: On October 26, 1981, Arntt sold the Chevrolet Luv for $5,000.

3. A 1980 Pontiac; balance on note—$6,000. Statement: On November 10, 1981, Arntt said that "there was a lien filed with GMAC on the title and, as soon as that was released, [Alliance National] would receive" the certificate of title for the Pontiac. Alliance National advanced $6,000 to Arntt on November 10, relying on promised delivery of the Pontiac's title as soon as GMAC released its lien. Arntt sold the Pontiac on November 18 and received a check for the purchase price. On November 23 Arntt deposited proceeds from sale of the Pontiac, $6,350, in the checking account of Arntt's Auto Sales. Fact: There was no GMAC lien noted on the Pontiac title.

4. A 1978 Chevrolet pickup; balance on note—$4,200. Statement: On November 24, 1981, Arntt said he needed the certificate of title for the pickup to complete a sale with a North Platte dealer and to receive proceeds from the sale of that pickup. Fact: The pickup had already been sold and Arntt received sale proceeds of $5,400 on November 12, 1981.

With receipt of the proceeds from the Pontiac sale, Arntt had received $24,025 from the sales of the four inventoried vehicles mentioned but never applied those sale proceeds as a payment of either principal or interest on any of his promissory notes

pertaining to the vehicles sold. From October 19 to October 28, the highest balance in the checking account for Arntt's Auto Sales was $23,865.57. Between November 12, 1981, and the end of that year, the highest balance in the checking account of Arntt's Auto Sales was $7,951.44. Arntt used sale proceeds from the four vehicles mentioned above for "business ventures other than the used car business." In January 1982 Arntt admitted to bank personnel that he "had not been altogether honest" with Alliance National regarding disposition of the sale proceeds.

Each of the separate notes pertaining to the four inventoried vehicles was received in evidence, showing the principal sum owed by Arntt and the rate of interest assessable. Bilstein, the loan officer, testified regarding the balance due on each of Arntt's promissory notes given to Alliance National, a total indebtedness of $20,437. Over State Surety's objection and during testimony of Alliance National's cashier, the court admitted into evidence a seven-page document prepared by the cashier and the bank's president. Concerning that exhibit, the cashier prepared the first three pages of the handwritten document, while the bank president prepared the last four pages. The document was a "detail of the official bank records that are on the ledger sheet and contained in the computer records." According to computations shown on the handwritten summary, indebtedness pertaining to the loans on Arntt's inventoried vehicles was $33,359.93.

The district court awarded a judgment of $20,000 to Alliance National.

State Surety's assignments of error relate to proof of Arntt's fraud and damages, namely, the district court erred (1) in admitting hearsay—Arntt's statements to Bilstein; (2) in finding that Alliance National had proved Arntt's "fraudulent intent"; (3) in awarding damages not sustained by sufficient evidence; and (4) in admitting as an exhibit the summary of loan transactions.

To recover on a claim for fraud, Alliance National must show (1) that a representation was made; (2) that the representation was false; (3) that, when made, the representation was known to be false, or made recklessly

without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff reasonably did so rely; and (6) that he or she suffered damage as a result. See, *Nielsen v. Adams, ante* p. 262, 388 N.W.2d 83 (1986); *ServiceMaster Indus. v. J.R.L. Enterprises, ante* p. 39, 388 N.W.2d 83 (1986).

To prove Arntt's misrepresentations, Alliance National offered the statements made by Arntt to Bilstein, the bank's loan officer. Were Arntt's statements hearsay? If hearsay, Arntt's statements were inadmissible on account of Neb. Evid. R. 802 (Neb. Rev. Stat. § 27-802 (Reissue 1985)): "Hearsay is not admissible except as provided by these rules or by other rules adopted by the statutes of the State of Nebraska."

As defined in Neb. Evid. R. 801(3) (Neb. Rev. Stat. § 27-801(3) (Reissue 1985)): "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted . . . ."

However, not every utterance is hearsay.

[A] situation in which utterances are not offered testimonially arises when the utterance accompanies conduct to which it is desired to attach some legal effect. The conduct or act has intrinsically no definite significance, or only an ambiguous one, and its whole legal purport or tenor is to be more precisely ascertained by considering the words accompanying it. The utterance thus enters merely as a verbal part of the act or, in the common phrase, a "verbal act."

6 J. Wigmore, Evidence in Trials at Common Law § 1772 at 267 (J. Chadbourn rev. 1976).

According to Wigmore, there are four limitations which attend use of utterances as verbal acts, namely:

(1) The conduct to be characterized by the words must be *independently material to the issue*;

(2) The conduct must be *equivocal*;

(3) The words must aid in *giving legal significance to the conduct*;

(4) The words must *accompany the conduct*.

(Emphasis in original.) *Id*. at 268.

A verbal act has been characterized as an "operative fact which gives rise to legal consequences." 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801 (c)[01] at 801-71 (1985). Thus, where an utterance constitutes an operative fact resulting in legal consequences, such utterance is a verbal act. Recognizing that Neb. Evid. R. 801 is patterned on the Federal Rules of Evidence, we believe the advisory committee note to Fed. R. Evid. 801(c) is helpful:

> If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. . . . The effect is to exclude from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights.

Consequently, where testimony is offered to establish existence of a statement rather than to prove truth of that statement, the hearsay rule does not apply. See *Stewart-Smith Haidinger v. Avi-Truck, Inc.*, 682 P.2d 1108 (Alaska 1984). As expressed in *Menorah Medical Center v. Davis*, 463 S.W.2d 618, 621 (Mo. App. 1971):

> What is necessary [for admissibility of a "verbal act"] is that the conduct out of which the verbal act arises be equivocal and germane to the issues of the case so that such conduct is relevant and material evidence. This being found, the verbal portion of the conduct which explains such equivocal conduct is admissible.

In *United States v. Gibson*, 690 F.2d 697 (9th Cir. 1982), Gibson set up a corporation to market fast-food franchises. Gibson's sales personnel represented that a franchise included certain business services, when in fact such services were nonexistent. In prosecuting Gibson for mail fraud, wire fraud, and inducing people to travel in interstate commerce for purposes of fraud, the government produced investors who were allowed to testify about statements made by Gibson's sales personnel. In holding that statements made to investors were not hearsay and were, therefore, admissible, the court stated:

> The investors' testimony was offered to prove the *existence* of a scheme; the statements were not offered for

> their truthfulness. The purpose of the testimony was solely to establish the fact that the salesmen and employees had made the statements. That fact was relevant to support the government's allegation that a scheme existed.

(Emphasis in original.) *Id*. at 700. See *United States v. Adkins*, 741 F.2d 744 (5th Cir. 1984) (hearsay is a statement offered in evidence to prove the truth of the matter asserted; when a statement is introduced to prove the falsity of the matter asserted, the statement is not inadmissible as hearsay). See, also, *Ristine v. Geigy Agricultural Chemicals*, 188 Neb. 550, 198 N.W.2d 199 (1972) (claim for product liability; representation by chemical manufacturer's agent was not inadmissible as hearsay but was admissible to show a particular statement had been made to the plaintiff, who relied on such statement).

Risks considered in evaluating a witness' testimony include perception, memory, and narration. See McCormick on Evidence § 245 (E. Cleary 3d ed. 1984). In reference to a verbal act,

> one would be interested only in the fact that a statement was made. Its probative value would depend on the witness testifying to what he heard, and, as such a witness, he would be subject to cross-examination. The problems of ambiguity, sincerity, memory or perception associated with hearsay are not present because we are concerned with the witness' account of what he heard, not the truth of what the declarant said.

*United States v. Reynolds*, 715 F.2d 99, 102 (3d Cir. 1983).

Arntt's statements were not offered to prove the truth of matters asserted within those statements. Rather, Arntt's statements were integral issues in Alliance National's case, because Arntt's representations were independently material to a determination whether fraud had been perpetrated. Arntt's statements constituted untruthful representations or misrepresentations made during the transaction involving the bank and became essential components of the transactions themselves, filling out or giving legal significance to the bank's conduct, namely, detrimental reliance in relinquishing its "collateral" or extending credit as a special event and not as

another ordinary occurrence in an active commercial setting. The statements in question were a premise or predicate in a claim for fraud. Under such circumstances Arntt's statements were operative facts resulting in legal consequences—rights and liability consequent to fraud—and were verbal acts affecting the bank's rights or bearing on conduct affecting the bank's rights. As verbal acts, Arntt's statements were not hearsay under Neb. Evid. R. 801(3) and, therefore, were not inadmissible hearsay prohibited by Neb. Evid. R. 802. The district court correctly admitted Arntt's statements.

Next, State Surety contends Alliance National failed to prove Arntt's "fraudulent intent" but showed only that Arntt did not carry out his promise to satisfy his indebtedness by paying the bank after the vehicular sales. To support its position State Surety relies on *Sterner v. Lehmanowsky*, 173 Neb. 401, 412, 113 N.W.2d 588, 595 (1962), where this court stated: "[F]raud is not proved by the mere failure to keep a promise or to pay a debt."

A promise, made by a promisor who has the intent not to perform such promise when made, may constitute fraud. In *Leichner v. First Trust Co.*, 133 Neb. 170, 176, 274 N.W. 475, 478 (1937), we stated: "[F]raud may be predicated under some circumstances of the making of a promise with a then existing intent not to fulfil such promise . . . ." See, also, *Bennett v. Kiggins*, 377 A.2d 57, 61 (D.C. 1977) ("when a person positively states that something is to be done or is to occur, when he knows the contrary to be true, the statement will support an action in fraud"). The rationale for the rule that failure to perform a promise may constitute a fraud is found in *Brown v Lockwood*, 76 A.D.2d 721, 732, 432 N.Y.S.2d 186, 194 (1980):

> The theory upon which this result is based is that the existence of a person's intention or nonintention to perform . . . a certain act is a question of fact. Where a party represents that he intends to act when in actuality he has no such intention, he has made a misrepresentation as to his state of mind and has thus misrepresented a then existing fact. . . .
>
> . . . .
>
> "In other words, a person's existing intent shows his

state of mind, and a person's state of mind is an existing fact, and when one asserts that he intends to or will do a certain thing in the future, when in fact he has no such intention, that is a statement of an existing fact and not a recital simply promissory in its nature."

In a law action fraud must be proved by a preponderance of evidence. See *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985). However, as we indicated in *Nielsen v. Adams, ante* p. 262, 388 N.W.2d 840 (1986), a claimant does not have to prove intent to deceive to sustain a cause of action for fraudulent misrepresentation or deceit.

Fraud may be proved by circumstantial evidence.

"Fraud in a transaction may be proved by inferences which may reasonably be drawn from intrinsic evidence respecting the transaction itself . . . or extrinsic circumstances surrounding the transaction. In fact, many of the elements of fraud are such as not to be susceptible of proof by direct testimony. Fraud in its nature is not a thing susceptible of ocular observation or readily demonstrable physically; it must, of necessity, be proved in many cases by inferences from the circumstances shown to have been involved in the transaction in question."

*Falkner v. Sacks Bros.*, 149 Neb. 121, 129-30, 30 N.W.2d 572, 577 (1948). See *Russo v. Williams*, 160 Neb. 564, 572, 71 N.W.2d 131, 138 (1955) (" 'Direct evidence is not essential to establish fraud. It may be inferred from circumstances; but such inference must not be guesswork or conjecture, but the rational and logical deduction from the circumstances proved' ").

For over a year before the transactions in issue, Arntt and Alliance National had been involved in 36 sales, where certificates of title were delivered to Arntt, who then paid the bank after each sale. For a span exceeding 1 month, from October 19 to November 24, 1981, Arntt made separate misrepresentations regarding four vehicles during a series of events over a protracted period. Arntt represented that the certificates of title were necessary to complete sales of the pickup and van, when, in fact, the sales had already occurred and sale proceeds had been received by Arntt. After sales of the

van and Luv, Arntt had sufficient funds in October 1981, namely, $23,865.57, to pay the notes concerning those two vehicles, but he never paid any amount on any of the notes. Also, Arntt had sufficient money to pay his indebtedness concerning the pickup, but failed to do so. Rather, Arntt used sale proceeds for purposes other than his automobile business and payment of his debt to Alliance National. The evidence is undisputed that there was no GMAC lien noted on the Pontiac's certificate of title. Arntt stated to bank personnel that he "had not been altogether honest" with the bank regarding disposition of sale proceeds, and never made any attempt to carry out his promise to pay Alliance National. The circumstances surrounding the transactions warrant the inference that Arntt did not intend to perform his promise to pay Alliance National. The evidence further supports the conclusion that Arntt harbored a clandestine intent not to carry out his promise to pay, when he made such promise to Alliance National.

State Surety's third assignment of error is that the trial court failed to adduce sufficient evidence on damages. In a law action for fraud, one injured as the result of fraud is entitled to recover such damages as will compensate for the loss or injury actually caused by the fraud and place the defrauded party in the same position as would have existed had there been no fraud. See *Harsche v. Czyz*, 157 Neb. 699, 61 N.W.2d 265 (1953). In *Luscher v. Empkey*, 206 Neb. 572, 577, 293 N.W.2d 866, 869 (1980), we stated: "False representations must be the proximate cause of the damage before a party may recover." But for the misrepresentations by Arntt, Alliance National would not have returned the certificates of title to Arntt and would not have advanced $6,000 to Arntt as a loan on the Pontiac. However, as a result of Arntt's misrepresentation regarding the Pontiac title, a loan of $6,000 was extended to Arntt. Alliance National also returned certificates of title to Arntt, who realized $24,025 from the sales of inventoried vehicles, but who failed to pay Alliance National $20,437—the balance of the indebtedness Arntt agreed to pay when he obtained the certificates of title and received additional credit. When Alliance National produced evidence that, as a result of Arntt's fraud, the bank

relinquished its collateral for $14,437 and extended additional credit of $6,000, Alliance National adequately demonstrated damages of $20,437, an amount above the maximum indemnifiable under State Surety's bond. There was no need to prove damages beyond the maximum indemnification provided by State Surety's bond. Evidence of Alliance National's damages is sufficiently established.

State Surety's final assignment of error is directed to the trial court's receiving into evidence the cooperative summary prepared by the cashier and the president of Alliance National. The documentary summary, being hearsay, was inadmissible. See Neb. Evid. R. 802.

The inadmissible evidence related to the issue of damages resulting from nonpayment of Arntt's indebtedness. However, relevant evidence properly admitted by the trial court provided proof and established damages sustained by Alliance National quite apart from contents of the documentary summary as an exhibit. To constitute reversible error contemplated in Neb. Evid. R. 103(1) (Neb. Rev. Stat. § 27-103(1) (Reissue 1985)), admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about such evidence admitted or excluded. We conclude that no substantial right of State Surety was unfairly prejudiced by admission of the documentary evidence in question, because other relevant evidence was admitted and showed the nature and extent of Arntt's indebtedness to Alliance National. Whether the memorandum in question qualified as a summary of voluminous writings, admissible under Neb. Evid. R. 1006 (Neb. Rev. Stat. § 27-1006 (Reissue 1985)), is not raised and, therefore, is not decided. Under the circumstances, although the documentary evidence was inadmissible, admission of such evidence was harmless error and does not require reversal of the district court's judgment.

Further, as we expressed in *Gibson v. City of Lincoln*, 221 Neb. 304, 311, 376 N.W.2d 785, 790 (1985):

In a bench trial, that is, all factual determinations made by a judge and not by a jury, we apply the principle or "presumption" that the trial court will consider only relevant and otherwise admissible evidence so that an

erroneous admission of evidence during a bench trial will not result in a reversal, if there is relevant and admissible evidence to sustain the trial court's judgment.

Thus, in the Supreme Court's review of a case tried without a jury, the admission of inadmissible evidence will not ordinarily be a ground of reversal, if there is admissible evidence received sufficient to support the findings of the trial court.

For the foregoing reasons the judgment of the district court is affirmed.

AFFIRMED.