ED MILLER & SONS, INC., A NEBRASKA CORPORATION, APPELLEE, V. GEORGE F. EARL, APPELLANT.

502 N.W.2d 444

Filed July 9, 1993.   No. S-91-222.

Robert G. Dailey, of McGrath, North, Mullin & Kratz, P.C., for appellant.

Kevin R. Hopp, of Richards, Riekes, Brown & Zabin, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

SHANAHAN, J.

George F. Earl appeals from judgments of the district court for Douglas County which awarded damages to Ed Miller & Sons, Inc. (Miller), in an action for breach of a lease.

### STANDARD OF REVIEW

"An action for damages resulting from a breach of contract is a law action." *Ballard v. Giltner Pub. Sch.*, 241 Neb. 970,

973, 492 N.W.2d 855, 857 (1992). Accord *Buckingham v. Wray*, 219 Neb. 807, 366 N.W.2d 753 (1985).

> In a bench trial of a law action, a trial court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.

*Broekemeier Ford v. Clatanoff*, 240 Neb. 265, 267, 481 N.W.2d 416, 418 (1992). Accord, *In re Estate of Watkins, ante* p. 583, 501 N.W.2d 292 (1993); *Young v. Dodge Cty. Bd. of Supervisors*, 242 Neb. 1, 493 N.W.2d 160 (1992); *Ballard v. Giltner Pub. Sch., supra.*

"When neither the terms of a contract nor facts and circumstances demonstrating the intent of the parties are disputed, construction of a contract is a question of law." *Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 241, 383 N.W.2d 29, 31 (1986). "Regarding a question of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review." *Huffman v. Huffman*, 232 Neb. 742, 748, 441 N.W.2d 899, 904 (1989). Accord, *In re Estate of Watkins, supra*; *Sports Courts of Omaha v. Meginnis*, 242 Neb. 768, 497 N.W.2d 38 (1993).

## BACKGROUND

Miller's premises, leased to Earl, consisted of shop facilities on a 4½-acre site and an asphalt parking lot composed of 2 to 3 inches of asphalt laid over a 6- to 8-inch bed of crushed rock. From 1974 to 1983, Miller used the premises in its construction business. During this time, Miller performed routine maintenance on the parking lot, including application of hot tar each spring and fall to fill cracks in the lot. In 1983, when the lot was in good repair, the premises were turned over to Earl under a 5-year lease which, at Earl's option, was extended for an additional 5 years. The lease contained the following:

> In consideration of the foregoing demise and the rate of

rental herein stipulated, the Lessee agrees during the term of this lease, at his own expense, to keep in good and substantial order and repair and to make all necessary repairs, renewals, replacements and decorations upon or in connection with said premises, including all . . . heating equipment . . . and all other equipment, fixtures and appurtenances . . . .

. . . .
. . . The Lessor . . . shall have the right to enter said premises at all reasonable times, to examine or . . . to make such repairs . . . .

Additionally, paragraph 31 of the lease stated:

The Lessee shall have full and complete responsibility for maintenance, replacement and repair of all buildings and other improvements contained within the property including by way of example and not by way of limitation all parking areas, roadways, external building surfaces, roofs and other improvements on the property as well as all items specified in paragraph 6 of this lease during the term of this lease and any extensions thereof. In the event of failure of Lessee to so maintain, replace or repair any such items, the Lessor may cause such work to be done and the cost thereof with interest at sixteen percent (16%) shall be additional rental due and payable forthwith hereunder. It is mutually agreed that such maintenance, repairs and replacements required will be that which will reasonably maintain the property in its present condition, reasonable wear and tear excepted.

After 1983, the parking lot began to deteriorate. According to a paving contractor who inspected the lot for Miller in July 1990, the lot was "rough and deteriorating" and had large areas that required an overlay of new asphalt. One area had deteriorated so badly that it needed to be torn up and completely replaced. Deterioration was not caused by ordinary wear and tear; rather, the deterioration was caused by failure to fill cracks in the asphalt, thereby allowing water to seep beneath the asphalt, soften the subbase, and cause additional extensive cracking and large holes in the asphalt surface. Miller made, and Earl refused, several demands that Earl repair the lot.

From October 1988 to September 1991, rent on the premises was $5,000 per month. However, in addition to his refusal to repair the parking lot, in 1989 Earl began withholding rent to cover the cost of other repairs to the premises. In December 1989, Earl withheld $3,035 from rent for the cost of repairs to the shop's roof and replacement of two furnaces. Earl also withheld $1,320 in March 1990 for the cost of replacing a roof, $5,000 in October 1990 for part of the cost of painting a building, and $3,885 in November 1990 for the remaining cost of painting the building and for the cost of replacing another roof. Additionally, Earl refused to pay $1,164 in premiums for casualty insurance on the premises for the period from May 15, 1990, to May 15, 1991, as required by the lease.

## PLEADINGS AND TRIAL

In December 1989, Miller sued Earl and, in an amended petition filed on November 28, 1990, sought damages for unpaid rent ($13,240), insurance premiums paid by Miller ($1,164), and the projected cost of repairing the parking lot ($23,238).

In his answer, filed on December 28, 1990, Earl alleged that Miller had misrepresented the condition of the premises and that such misrepresentation induced Earl to enter the lease and later necessitated $13,240 in repairs by Earl, entitling him to a "setoff" in that amount against any rent due under the lease. Also, Earl's pleading included a counterclaim in which Earl alleged Miller's misrepresentation of the premises and sought rescission of the lease or damages based on the difference in rental value, that is, the rental value of the premises if the property had been as represented versus the actual rental value in view of the misrepresented condition.

At trial, Miller presented evidence that Earl failed to pay rent of $13,240 and had failed to pay the casualty insurance premiums of $1,164. Also, Robert Miller, an officer of the Miller corporation, testified that the leased premises diminished in value by $50,000 as a result of the damaged parking lot. The estimated cost of repair to the asphalt parking lot ranged between $23,000 and $24,000.

According to Earl, Miller misrepresented the condition of

the premises by stating, before the lease was signed in 1983, that the premises were in "first class condition." Sometime around January 1, 1984, Earl discovered that furnaces in the shop were inoperable as the result of problems with the gaslines for the furnaces.

The district court awarded judgments to Miller in accordance with Miller's prayer for damages ($37,642) and dismissed Earl's counterclaim.

## ASSIGNMENTS OF ERROR

Earl contends that the district court erred in (1) awarding Miller damages for the estimated cost of repairs to the parking lot when Miller had not actually repaired the lot; (2) using repair costs as the measure of damages for breach of a covenant to repair rather than damages based on the diminished value of Miller's reversionary interest; (3) failing to find that the damage to the parking lot resulted from reasonable wear and tear; and (4) failing to allow recoupment as the result of Miller's misrepresentation or failing to order relief, either rescission or damages, based on Miller's misrepresentation concerning the leased premises.

## ACTION FOR BREACH OF A LESSEE'S COVENANT TO REPAIR

Earl refers to paragraph 31 of his lease:

The Lessee shall have full and complete responsibility for maintenance, replacement and repair of all buildings and other improvements contained within the property including . . . all parking areas . . . . In the event of failure of Lessee to so maintain, replace or repair any such items, the Lessor may cause such work to be done and the cost thereof with interest at sixteen percent (16%) shall be additional rental due and payable forthwith hereunder.

Earl then focuses on the second sentence in paragraph 31 and argues that this provision requires that Miller must actually complete repairs to the parking lot before Miller can sue for damages from the breach of the covenant to repair. In other words, actual repairs are a condition precedent to accrual of a lessor's cause of action for breach of a covenant to repair leased premises.

Traditionally and generally in Nebraska, a cause of action accrues when an injury occurs and the aggrieved party, therefore, has a right to institute and maintain a suit for redress. *Rosnick v. Marks*, 218 Neb. 499, 357 N.W.2d 186 (1984); *Interholzinger v. Estate of Dent*, 214 Neb. 264, 333 N.W.2d 895 (1983); *Grand Island School Dist. #2 v. Celotex Corp.*, 203 Neb. 559, 279 N.W.2d 603 (1979). Consequently, a cause of action for breach of contract accrues as soon as the breach occurs. See *id*.

Paragraph 31 of the Miller-Earl lease contains two distinct and unambiguous provisions pertaining to repair of the premises. First, Earl must maintain and repair the leased premises. Second, on Earl's failure to maintain and repair the premises, Miller may enter the premises, cause necessary repair work to be done, and charge the cost of repairs as additional rent. Thus, the first provision of paragraph 31, as a covenant to repair, imposes on Earl the affirmative duty to maintain and repair the premises. See *Gehrke v. General Theatre Corp.*, 207 Neb. 301, 298 N.W.2d 773 (1980) (a covenant to repair imposes on a lessee the affirmative obligation to make necessary repairs).

Considering a breach of covenant to repair, the court stated in *Middendorf v. Fuqua Industries, Inc.*, 623 F.2d 13, 18 (6th Cir. 1980): "[A] covenant to keep the premises in repair is breached at any time during the term that reasonably necessary repairs are not made by the lessee, and the lessor may bring an action for this breach forthwith rather than waiting until the end of the term." See, also, *Corbett v. Derman Shoe Co.*, 338 Mass. 405, 155 N.E.2d 423 (1959) (a lessor is entitled to maintain an action for breach of a covenant to repair as soon as the lessee fails to repair the premises); *Avelez Hotel Corp. v. Milner Hotels*, 227 Miss. 808, 87 So. 2d 63 (1956) (during a lease's term, a lessor's cause of action accrues when the lessee breaches a covenant to repair the premises; therefore, the lessor need not wait until the end of the lease's term before commencement of an action); *McKinney v. White Sewing Machine Corp.*, 32 Ohio Op. 2d 306, 200 N.E.2d 596 (1964) (a lessor has a cause of action for breach of a covenant to repair which occurs during the leasehold term). Hence, a cause of

action based on breach of a covenant to repair in a lease accrues when the party obligated to repair anticipatorily repudiates the covenant; fails to undertake the repairs within a reasonable time; or, after undertaking to repair, abandons the repairs before completion. See, *Hilliard & Bartko v. Fedco Systems*, 309 Md. 147, 522 A.2d 961 (1987); *Antigua Condominium v. Melba Investors*, 307 Md. 700, 517 A.2d 75 (1986). We hold, therefore, that when a lessee during the term of a lease breaches a covenant to repair the leased premises, the lessor may bring an action as soon as the breach occurs.

The second provision of paragraph 31 in the Miller-Earl lease provides that rather than bringing an action for breach of the covenant to repair, Miller had the option to enter and repair the premises and then charge Earl with the cost of repairs as additional rent. Consequently, under the provisions of the lease, at any time during the term of the lease Miller could bring an action for Earl's breach of the covenant to repair the premises or cause repairs to be made and charge Earl with additional rent based on the cost of the repairs made.

## DAMAGES: REPAIR COSTS V. DIMINISHED VALUE

If a lessee breaches a covenant to repair during the term of a lease, what remedy is available to the lessor?

Earl argues that diminution of Miller's reversionary interest, not the cost of repairs to the parking lot, is the only measure of damages for a lessee's breach of a covenant to repair. This court has not previously determined the proper measure of damages for a lessee's breach of covenant to repair leased premises during the term of a lease.

In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position he or she would have occupied if the contract had been performed, that is, to make the injured party whole. See, *Ducheneaux v. Miller*, 488 N.W.2d 902 (S.D. 1992); *Macal v. Stinson*, 468 N.W.2d 34 (Iowa 1991). See, also, *Wells Fargo Alarm Serv. v. Nox-Crete Chem.*, 229 Neb. 43, 424 N.W.2d 885 (1988); *Stansbery v. Schroeder*, 226 Neb. 492, 412 N.W.2d 447 (1987); *May v. Marijo Corp.*, 207 Neb. 422, 299 N.W.2d 433

(1980); *Fink v. Denbeck*, 206 Neb. 462, 293 N.W.2d 398 (1980); Restatement (Second) of Contracts § 347 (1981). Cf. *Birkel v. Hassebrook Farm Serv.*, 219 Neb. 286, 289, 363 N.W.2d 148, 151 (1985): "As a general rule, a party injured by a breach of contract is entitled to recover all damages which are reasonably certain and which are naturally expected to follow the breach."

Generally, in a lessor's suit brought before expiration of a lease's term, the measure of damages for a lessee's breach of a covenant to repair the leased premises is the reduction in value of the lessor's reversion, that is, the difference in the value of the premises with and without repairs. *Matter of D. H. Overmyer Co., Inc.*, 12 B.R. 777 (Bankr. S.D.N.Y. 1981), *aff'd* 30 B.R. 823 (Bankr. S.D.N.Y. 1983); *Middendorf v. Fuqua Industries, Inc.*, 623 F.2d 13 (6th Cir. 1980); *Tobin v. Union News Co.*, 18 A.D.2d 243, 239 N.Y.S.2d 22 (1963), *aff'd* 13 N.Y.2d 1155, 196 N.E.2d 735, 247 N.Y.S.2d 385 (1964); *Corbett v. Derman Shoe Co.*, 338 Mass. 405, 155 N.E.2d 423 (1959); *National Bank v. Voigt Estate*, 357 Mich. 647, 99 N.W.2d 504 (1959); *Gold Min. & Water Co. v. Swinerton*, 23 Cal. 2d 19, 142 P.2d 22 (1943); *Pennsylvania Cement Co. v. Bradley Contracting Co.*, 11 F.2d 687 (2d Cir. 1926). One rationale for this general rule is that in situations involving long-term leases, awarding the current cost of repairs to the leased premises would give the lessor a windfall because the lessor would receive the current cash value of repairs rather than the present worth or discounted value of repairs at the end of the lease's term. *Matter of D. H. Overmyer Co., Inc., supra*; *Corbett v. Derman Shoe Co., supra*; *Pennsylvania Cement Co. v. Bradley Contracting Co., supra*. Another rationale for the general rule is that if repair costs were awarded, there would be no guarantee that the lessor would use the amount awarded to actually make repairs. *Matter of D. H. Overmyer Co., Inc., supra*; *Middendorf v. Fuqua Industries, Inc., supra*; *National Bank v. Voigt Estate, supra*; *Gold Min. & Water Co. v. Swinerton, supra*; 49 Am. Jur. 2d *Landlord and Tenant* § 957 (1970). However, in a lessor's suit before expiration of a lease's term, when repair costs provide a reasonably accurate measure of damages to a lessor as a result of a lessee's breach of a covenant to repair and do not result in a windfall to the lessor, repair costs may be used as the proper

measure of damages. See, *Matter of D. H. Overmyer Co., Inc., supra*; *Bowes v. Saks & Company*, 397 F.2d 113 (7th Cir. 1968).

Here, the only evidence of the leased premises' diminished value is Robert Miller's uncontroverted testimony that the value of the leased premises was diminished by $50,000 as the result of the damaged and unrepaired parking lot. Thus, damages awarded on the basis of the premises' diminished value would have provided an award significantly greater than an award based on the cost of repair. Moreover, the damaged parking lot was inspected in 1990, approximately 3 years before expiration of the lease's term, and repairs to the lot were estimated to cost between $23,000 and $24,000. Given the cost of repairs at a time shortly before expiration of the lease, Miller would obtain no windfall recovery through an award based on the estimated cost of repairs to the premises. Because the repair costs provided a reasonably accurate measure of damages without a windfall to Miller, the district court did not err in using the repair costs as a basis for the damages awarded to Miller.

## REASONABLE WEAR AND TEAR

Earl asserts that the district court erred in failing to find that the damage to the parking lot resulted from reasonable wear and tear. "Determination of causation is, ordinarily, a matter for the trier of fact." *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 778, 408 N.W.2d 280, 285 (1987). Accord, *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990); *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988). Whether damage to the parking lot resulted from reasonable wear and tear or resulted from a breach of the covenant to maintain and repair the premises was a factual question for the district court, which concluded that the damage was caused by Earl's failure to maintain and repair the parking lot. The district court's factual determination concerning the cause of damage to the parking lot is not clearly erroneous.

## EARL'S ASSERTION OF FRAUD

Earl claims that Miller's fraudulent representation that the premises were in a "first class condition" serves as a defense to Miller's breach of contract action and also provides a basis for Earl's counterclaim.

718

### Statute of Limitations.

Under Neb. Rev. Stat. § 25-207 (Reissue 1989), an action for relief on the ground of fraud must be brought within 4 years after perpetration of the fraud, but the cause of action is not deemed to have accrued until discovery of the fraud. "*Discovery*, as used in reference to a statute of limitations, means that an individual acquires knowledge of a fact which existed but which was previously unknown to the discoverer." *League v. Vanice*, 221 Neb. 34, 42, 374 N.W.2d 849, 854 (1985). Accord *Broekemeier Ford v. Clatanoff*, 240 Neb. 265, 481 N.W.2d 416 (1992).

### Recoupment and Counterclaim.

In an attempt to circumvent the statute of limitations, Earl pleaded the defense of recoupment, which has been described as a

> "[d]efalcation or discount from a demand. A keeping back something which is due, because there is an equitable reason to withhold it. . . ."
>
> . . . .
>
> " 'Recoupment' differs from 'set-off' in this respect: that any claim or demand the defendant may have against the plaintiff may be used as a set-off, while it is not a subject for recoupment unless it grows out of the very same transaction which furnishes the plaintiff's cause of action. . . ."

*In re Estate of Massie*, 218 Neb. 103, 109, 353 N.W.2d 735, 740 (1984), *overruled on other grounds, In re Estate of Price*, 223 Neb. 12, 388 N.W.2d 72 (1986) (quoting Black's Law Dictionary 1439-40 (4th ed. 1957)). See, also, 80 C.J.S. *Set-Off and Counterclaim* § 2 (1953).

Recoupment may be distinguished from a counterclaim. A counterclaim seeks an affirmative judgment and need not arise out of the same transaction or occurrence which is the basis of a plaintiff's action. Recoupment, on the other hand, must arise out of the same transaction or occurrence which is the basis of a plaintiff's action and is merely defensive, that is, does not seek an affirmative judgment in the action. See *Katskee v. Nevada Bob's Golf of Neb.*, 238 Neb. 654, 472 N.W.2d 372 (1991).

A counterclaim, seeking an affirmative judgment or relief, is

barred by a statute of limitations unless the counterclaim is filed within the applicable statutory period for commencement of an action. See *Katskee v. Nevada Bob's Golf of Neb., supra.* Unlike a counterclaim that seeks an affirmative judgment, the defense of recoupment is not barred by a statute of limitations. See, *id.; In re Estate of Massie, supra; Mobil Oil Corp. v. Grantham,* 200 Neb. 782, 265 N.W.2d 669 (1978); *Nathan v. McKernan,* 170 Neb. 1, 101 N.W.2d 756 (1960); *Kaup v. Schinstock,* 88 Neb. 95, 129 N.W. 184 (1910). Therefore, although Earl's defense of recoupment based on misrepresentation is not barred by the statute of limitations, Earl's counterclaim for misrepresentation is barred by the statute of limitations in § 25-207.

*Misrepresentation of a Material Fact.*

Earl's allegation of fraud is based on Miller's statement that the premises were in a "first class condition."

"Misrepresentation is a manifestation, by word or conduct, which constitutes an assertion not in accordance with fact." *Edwin Bender & Sons v. Ericson Livestock Comm. Co.,* 228 Neb. 157, 162, 421 N.W.2d 766, 770 (1988). Accord *Dammann v. Litty,* 234 Neb. 664, 452 N.W.2d 522 (1990).

To recover in an action for fraud based on misrepresentation of a material fact, a plaintiff must prove that (1) the defendant represented a material fact; (2) the represented fact was untrue; (3) the defendant knew that the represented fact was untrue, recklessly made the representation as a positive assertion without knowledge concerning the truth of the representation, or made the representation negligently as the result of a lack of reasonable care in ascertaining the fact represented or in the absence of skill and competence required by a particular business or profession; (4) the misrepresentation was made with the intention that the plaintiff would rely on it; (5) the plaintiff reasonably relied on the misrepresentation; and (6) as the result of such reliance, the plaintiff was damaged. See, *Broekemeier Ford v. Clatanoff,* 240 Neb. 265, 481 N.W.2d 416 (1992); *Flamme v. Wolf Ins. Agency,* 239 Neb. 465, 476 N.W.2d 802 (1991); *Edwin Bender & Sons v. Ericson Livestock Comm. Co., supra; Alliance Nat. Bank v. State Surety Co.,* 223 Neb. 403,

390 N.W.2d 487 (1986).

Earl's defense of recoupment necessitated that he prove those elements required in a plaintiff's successful action for fraud based on a misrepresentation of fact. Although in the first instance Earl alleged Miller's fraud as a basis of recoupment and later as a basis for rescission of the lease or an award of damages, the statute of limitations, § 25-207, removes any necessity for discussion of Earl's failure to elect remedies under his counterclaim. See *Christopher v. Evans*, 219 Neb. 51, 54, 361 N.W.2d 193, 195 (1985):

> A party who has been induced to enter into a contract by a material misrepresentation has, upon discovery of such misrepresentation, an election of remedies: either to affirm the contract and sue for damages or to disaffirm the contract and be reinstated to the induced party's position which existed before entry into the contract.

Accord, *Gitschel v. Sauer*, 212 Neb. 454, 323 N.W.2d 93 (1982); *Russo v. Williams*, 160 Neb. 564, 71 N.W.2d 131 (1955).

To constitute fraud, a misrepresentation must be an assertion of fact, not merely an expression of opinion. *Kliewer v. Wall Constr. Co.*, 229 Neb. 867, 429 N.W.2d 373 (1988); *Circle 76 Fertilizer v. Nelsen*, 219 Neb. 661, 365 N.W.2d 460 (1985); *Maser v. Lind*, 181 Neb. 365, 148 N.W.2d 831 (1967); *Beveridge v. Miller-Binder, Inc.*, 177 Neb. 734, 131 N.W.2d 155 (1964); *Nathan v. McKernan*, 170 Neb. 1, 101 N.W.2d 756 (1960); *Wegner v. West*, 169 Neb. 546, 100 N.W.2d 542 (1960); *Cook Livestock Co., Inc. v. Reisig*, 161 Neb. 640, 74 N.W.2d 370 (1956). Hence, fraud cannot be predicated on mere "sales talk" or "puffing." *Vavricka v. Mid-Continent Co.*, 143 Neb. 94, 8 N.W.2d 674 (1943); *Aron v. Mid-Continent Co.*, 143 Neb. 87, 8 N.W.2d 682 (1943). As Judge Learned Hand stated concerning sales talk or puffing:

> There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity. If we were all scrupulously honest, it would not be so; but, as it is, neither party usually believes what the seller says about his own opinions, and each knows it. Such statements, like the claims of campaign managers before election, are rather designed to allay the suspicion which would attend

their absence than to be understood as having any relation to objective truth.

*Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918), *cert. denied* 247 U.S. 507, 38 S. Ct. 427, 62 L. Ed. 1241.

The district court could have reasonably found, based on the evidence, that Miller's statement that the property was in "first class condition" was an expression of opinion and mere puffing relative to the prospective lease. See, *Baldwin v. Priem's Pride Motel, Inc.*, 224 Kan. 432, 580 P.2d 1326 (1978) (statement that house would be in first-class condition was puffing); *Strother Ford, Inc. v. Bullock*, 142 Ga. App. 843, 237 S.E.2d 208 (1977) (statement that car was in A-1 condition was puffing); *Randall v. Smith*, 136 Ga. App. 823, 222 S.E.2d 664 (1975) (statement that car was in good condition and suitable for driving was puffing). We cannot say that the district court erred as a matter of law in deciding against Earl on his allegation that Miller had misrepresented a material fact as an inducement to the lease. Moreover, implicit in the district court's judgment adverse to Earl on his defense of recoupment is a finding that Miller had not misrepresented a material fact concerning the leased premises, a finding which is not clearly erroneous. As previously noted, Earl's counterclaim is barred by the statute of limitations. Consequently, the district court did not err in dismissing Earl's defense of recoupment and Earl's counterclaim based on fraudulent misrepresentation.

AFFIRMED.