NECO, INC., A NEBRASKA CORPORATION, AND NASCO, INC.,
A NEBRASKA CORPORATION, APPELLANTS, V.
LARRY PRICE & ASSOCIATES, INC., A NEBRASKA CORPORATION,
AND LARRY PRICE, APPELLEES.

597 N.W.2d 602

Filed July 23, 1999.   No. S-98-553.

324

Randall V. Petersen, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellants.

Timothy R. Engler and Shana Q. Wright-Avery, of Harding, Shultz & Downs, for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

NECO, Inc., and NASCO, Inc., brought suit for fraudulent and/or negligent misrepresentation against Larry Price & Associates, Inc., and Larry Price, individually (collectively Price). The district court granted Price's motions for summary judgment, finding that the action was barred by the statute of

limitations. NECO and NASCO appealed this decision to the Nebraska Court of Appeals. We removed the case to our docket pursuant to our power to regulate the Court of Appeals' caseload and that of this court. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995). Viewing the evidence in a light most favorable to NECO and NASCO, we find summary judgment to be inappropriate. We therefore reverse, and remand for further proceedings.

## BACKGROUND

This case involves an unsuccessful commercial real estate agreement between Price and Don Nielsen, the president of NECO and NASCO. NECO is a family-owned corporation that provides and monitors fire safety and security systems, while NASCO serves as the administrative arm of NECO. (Hereinafter, we will refer to appellants collectively as Nielsen, since Nielsen controls and acts for NECO and NASCO.) After executing a purchase agreement, Nielsen refused to complete the agreement because the subject property was not located in a building with a complete fire sprinkler system. Nielsen brought a fraud claim against Price, asserting that he had represented to them that the building would have a complete sprinkler system, when in fact he knew he would be installing only a partial system.

In 1985, Price purchased and began renovating the Stuart Building, located on the southeast corner of 13th and P Streets in Lincoln, Nebraska. The building was renamed "University Towers." Price was granted permission from the city of Lincoln to complete the renovation in stages. This renovation involved converting several floors of a 12-story commercial building into residential units, making University Towers a combination of commercial and residential spaces.

On February 22, 1990, Nielsen executed an agreement to purchase units Nos. 130, 901, 902, and 903 in University Towers. The purpose of the purchase was to allow NECO to move its monitoring headquarters for all of its operations to University Towers and additionally, to have NECO provide the monitoring for the fire safety system in University Towers.

In 1986, when the remodeling process began, Price contracted with NIFCO Mechanical Systems, Inc. (NMSI), to

install the building's sprinkler system. A written memorandum was created, based on a meeting between NMSI and the Lincoln Fire Prevention Bureau. The memo is dated April 1, 1986, and was written by either Mark Long or Mike Coon, employees of NMSI. The memo states, "Sprinkler entire building, with these exceptions: 1. University Club dining area, restrooms, public areas. 2. Space above 10th floor if not combustible. 3. Theater seating areas or restrooms. 4. Barrymore's fly gallery if it is above 55' and it is." This document did not surface until the pretrial discovery process.

Nielsen initiated discussions with Price about relocating NECO to University Towers as early as 1987 or 1988. Nielsen testified in his deposition that during this time, he discussed the sprinkler system with Price and Price's architect, Bob Gibb.

Price gave Nielsen some articles published for promotional purposes concerning University Towers. These articles discuss the fire safety sprinkler system as a selling point for the facility. In particular, one article states, "It was not required that we install [fire] sprinklers . . . . However, the best possible fire control is the water sprinkler system, which we chose." Another article states, "Fire service people across the country have found that a totally operable and fully sprinklered facility has never had multiple loss of life."

Also included in the articles was a signed statement by Price stating,

> Our City Code did not require me to install a sprinkler fire system. When I purchased the Stuart Building and started to plan how I would refurbish the structure, the first decision that I made was to do everything possible to make it fire safe. . . . I would have never considered selling apartments without this fire system.

Gibb also wrote a letter to Nielsen stating that "the building has a new sprinkler system." Based on all of this information, Nielsen concluded that Price had voluntarily chosen to sprinkler the entire building. Nielsen asserts that Price's decision to sprinkler the entire building was a key factor in Nielsen's decision to purchase the units. In contrast, Price asserts in his deposition that the two parties never spoke about NECO's sprinkler needs during negotiations.

In 1989, Nielsen submitted information on University Towers to NECO's insurance provider, Underwriters Laboratories, Inc. (UL). Based on the provided information, UL determined that the new location would be satisfactory for NECO's main operations, in part because the building would have a complete sprinkler system.

After the discussions with Price and the positive response from UL, Nielsen entered into the purchase agreement in 1990. The total purchase price was $260,872.33 for units Nos. 130, 901, 902, and 903. Nielsen paid a $20,751.70 downpayment and $5,616.07 in closing costs. Nielsen also paid condominium fees and real estate taxes of $34,338.22. The remainder of the purchase price was set out in the agreement to be paid in three equal payments due in August 1990 and February and August 1991.

In early 1991, Nielsen visited the building to install an entryway security system. He noticed that the sprinkler system was not yet finished but testified that he was not concerned because he knew the sprinkler system was being added on an ongoing basis. As of 1992, and possibly later, NMSI was still installing portions of the sprinkler system at University Towers.

On April 18, 1991, Price sent a letter to Nielsen asking him to make a payment on the promissory note secured by the four units. Price had also sent a similar letter in November 1990. In response to Price's April 18 letter, Nielsen wrote back that he would do what he could to "allow for an earlier occupancy" and that "there would be no problem in moving up the payment schedule." Nielsen testified that their understanding was that "as soon as . . . we get to the point where we can beneficially start some activity about moving into the building, that [sic] we'll get it paid."

As a result of a series of communications with Price about the timetable for NECO's relocation, Nielsen sent Price a letter on November 12, 1991. This letter set out a timetable for the remodeling of units Nos. 901, 902, and 903; a final walkthrough inspection by UL; and the actual relocation date of NECO as December 1992. At the bottom of the letter, Nielsen noted his concerns regarding the sprinkler system. The letter stated that there were certain areas of the building that had not yet been sprinklered and that approval for the site from UL was

based on the information that the building would be fully sprinklered. Nielsen describes completing the sprinkler system as "the only point I am now aware of that needs to be addressed prior to the UL pre-construction visit."

According to Nielsen, from November 1991 to the fall of 1992, several conversations took place between Price and Nielsen regarding the building and the need to complete the sprinkler system. Price asserts, however, that he was unaware that the sprinkler system was holding Nielsen back from completing the agreement until a conversation at the University Club that took place sometime between September and December 1992. During this conversation, Price told Nielsen that the building was not going to be fully sprinklered. Nielsen agrees that sometime in the fall of 1992, a conversation took place in which Price made it clear he would not install sprinklers in the entire building.

On October 1, 1992, Nielsen wrote a letter to Price confirming his decision to discontinue the plans to relocate NECO to University Towers. The letter stated, "This will confirm our several recent discussions and the disappointing decision to discontinue plans to relocate NECO central-station operations in University Towers." The letter noted the reason for Nielsen's decision, namely that the "extension of fire sprinkler system coverage to several unsprinklered areas in order to meet our occupancy specification becomes more and more unrealistic with the passage of time and changing circumstances."

At this point, Price and Nielsen attempted to negotiate a settlement. Ultimately, the parties were unable to reach an agreement, and all four units were sold to another purchaser under a deed of trust in 1993. On November 1, 1995, Nielsen instituted this suit, seeking damages for the downpayment, closing costs, condominium fees, real estate taxes, and general damages. The district court granted Price's motion for summary judgment, based on its finding that Nielsen's claim was barred by the applicable statute of limitations. The court found that Nielsen knew or should have known prior to November 1, 1991, that the entire building would not be covered by the sprinkler system. In particular, the court focused on the fact that Nielsen had visited

University Towers in 1990 and 1991 and had observed that the sprinkler system was not installed in certain areas.

## ASSIGNMENT OF ERROR

Nielsen assigns as error the district court's order in granting Price's motion for summary judgment for the reason that genuine issues of material fact exist.

## STANDARD OF REVIEW

■ In reviewing an order granting a motion for summary judgment, an appellate court views the evidence in a light most favorable to the party opposing the motion and gives that party the benefit of all reasonable inferences deducible from the evidence. *Koltes v. Visiting Nurse Assn.,* 256 Neb. 740, 591 N.W.2d 578 (1999).

■ The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong. *Reinke Mfg. Co. v. Hayes,* 256 Neb. 442, 590 N.W.2d 380 (1999); *Bank of Papillion v. Nguyen,* 252 Neb. 926, 567 N.W.2d 166 (1997).

## ANALYSIS

■ The primary issue involved in this matter is when Nielsen's cause of action accrued. Before we address this issue, however, we must first determine whether this cause of action is predicated on a promise concerning a future event. Generally, fraud cannot be based on predictions or expressions of mere possibilities in reference to future events. *Pawnee County Bank v. Droge,* 226 Neb. 314, 411 N.W.2d 324 (1987), citing *In re Estate of Hesemann,* 214 Neb. 842, 336 N.W.2d 568 (1983). Nevertheless, fraud may be predicated on the representation that an event, which is in control of the maker, will or will not take place in the future, if the representation as to the future event is known to be false when made or is made in reckless disregard as to its truthfulness or falsity and the other elements of fraud are present. *Pawnee County Bank, supra; Mueller v. Union Pacific Railroad,* 220 Neb. 742, 371 N.W.2d 732 (1985). See, also,

*Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986).

The fraud, as alleged in the first amended petition in this case, is predicated on Price's promise to Nielsen that the entire building known as University Towers would be sprinklered. Such a promise could be found to be within the control of the maker, Price, and as such could fall within the *Pawnee County Bank, supra*, exception.

We now turn to whether Nielsen's claim was barred by the applicable statute of limitations. The district court held that Nielsen's claim accrued more than 4 years prior to instituting this cause of action because Nielsen had sufficient facts prior to November 1, 1991, which should have placed him on notice of the alleged fraud. Specifically, the court found that Nielsen visited the building in early 1991 and saw that the sprinkler system was not installed in the entire building, yet Nielsen waited until November 1, 1995, to bring his claim. Nielsen contends, however, that there are disputed facts as to when he knew or should have known that not all the building was going to be sprinklered.

Pursuant to Neb. Rev. Stat. § 25-207(4) (Reissue 1995), an action for fraud must be brought within 4 years of when the cause of action accrues. Such action does not accrue, however, until there has been a discovery of the facts constituting the fraud, or facts sufficient to put a person of ordinary intelligence and prudence on an inquiry which, if pursued, would lead to such discovery. *Bowling Assocs. Ltd. v. Kerrey*, 252 Neb. 458, 562 N.W.2d 714 (1997). As used in reference to a statute of limitations, "discovery" means that an individual acquires knowledge of a fact which existed but which was previously unknown to the discoverer. *Ed Miller & Sons, Inc. v. Earl*, 243 Neb. 708, 502 N.W.2d 444 (1993), citing *League v. Vanice*, 221 Neb. 34, 374 N.W.2d 849 (1985).

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Koltes v. Visiting Nurse Assn.*, 256 Neb. 740, 591

N.W.2d 578 (1999); *Reinke Mfg. Co. v. Hayes*, 256 Neb. 442, 590 N.W.2d 380 (1999). In reviewing an order granting a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists. *Kratochvil v. Motor Club Ins. Assn.*, 255 Neb. 977, 588 N.W.2d 565 (1999); *Smith v. Paoli Popcorn Co.*, 255 Neb. 910, 587 N.W.2d 660 (1999).

The facts in this case, and the reasonable inferences to be drawn from them, are disputed as to when Nielsen "discovered" facts sufficient to place him on actual notice or inquiry notice of the fraud. The actual process of installing a sprinkler system, and when it typically occurs in a piecemeal renovation project such as this one, is not set out in the record. The record does show, however, that the schedule for completing the sprinkler system was set by Price and NMSI. Nielsen was in no way responsible for the installation or completion of the sprinkler system.

In early 1991, when Nielsen saw that the sprinkler system was incomplete, one possible inference is that he was put on notice that Price was not going to fully sprinkler the building. However, Nielsen had knowledge that the city had given Price special permission to complete the renovation in stages. Considering the evidence in a light most favorable to Nielsen, an equally reasonable inference is that when he visited the building in 1991, Nielsen simply observed what progress had been made in the ongoing piecemeal process of installing the sprinkler system. This is supported by the record, which shows that the installation of the sprinkler system continued into 1992, well after Nielsen visited the building in 1991.

The facts are also disputed as to exactly what conversations Price and Nielsen had regarding the sprinkler system. Price asserts that not until 1992 did Nielsen express any concerns about fully sprinklering the building. However, in a letter to Price dated November 12, 1991, Nielsen refers to the sprinkler system and his concern that the building needs to be fully sprinklered. Further, Nielsen contends that Price always represented to him that the entire building would be sprinklered, and not until the fall of 1992, when renovation was still occurring, did Price inform him that a sprinkler system for the entire building

was not feasible. Price, on the other hand, claims that he never represented at any time that the entire building would be fully sprinklered.

Additionally, Price asserts that Nielsen refused to make the scheduled payments on the promissory note because he had actual knowledge that the building was not fully sprinklered. However, Nielsen's uncontested testimony indicates that the understanding of the agreement between Price and Nielsen was that payment would be made in full when NECO actually moved into University Towers and that the payment schedule was tentative.

■ Clearly, there are disputed issues regarding when Nielsen discovered the alleged fraud. The time of the discovery of a fraud is a question of fact and is to be determined, as are other disputed questions of fact, by the jury. *Vrbsky v. Arendt*, 119 Neb. 443, 229 N.W. 337 (1930). The determination of when Nielsen knew or should have known that the building would not be fully sprinklered was a disputed question of fact. As such, summary judgment was inappropriate.

## CONCLUSION

For the aforementioned reasons, we find that the district court was clearly wrong, for purposes of summary judgment, in determining that this action was barred by the statute of limitations. We therefore reverse, and remand for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.